[Civ. No. 45529. Second Dist., Div. Two. Oct. 20, 1975.]

STANDARD FRUIT AND STEAMSHIP COMPANY,
Cross-complainant and Appellant, v.
METROPOLITAN STEVEDORE COMPANY,
Cross-defendant and Respondent.

## COUNSEL

Yusim, Cassidy, Stein, Hanger & Olson and Charles L. Fonarow for Cross-complainant and Appellant.

Cooper, White & Cooper, R. Barry Churton, and Neil L. Shapiro for Cross-defendant and Respondent.

## OPINION

**COMPTON, J.**—Standard Fruit & Steamship Company (Standard) chartered the *M. V. Nordland,* a vessel owned by F. M. Baltic Frigomaris (Baltic) to haul a cargo of bananas to the Port of Long Beach. When the vessel docked, Standard contracted with Metropolitan Stevedore Co. (Metropolitan) for the latter to conduct the discharging of the cargo. During the unloading process a box fell from the deck of the ship striking and injuring one Trujillo, a longshoreman who was an employee of Metropolitan engaged in the work of unloading.

The federal Longshoremen and Harbor Workers Act (the Act) 33 United States Code Annotated section 901 et seq. [33 U.S.C.S. § 901 et seq.], provides workmen's compensation benefits to the injured employee. As is the general rule with such benefits they constitute Trujillo's exclusive remedy as against his employer, Metropolitan. (33 U.S.C.A. § 905 [33 U.S.C.S. § 905].)

Trujillo, however, commenced an action for negligence against Baltic alleging among other things that Baltic owned and was operating a defective conveyor at the time of the accident and that the injury resulted from such operation. Baltic filed its cross-complaint for indemnity against Standard alleging that the conveyor and the area of unloading were at the time of the accident under the exclusive control of Standard.

This appeal arises out of the filing by Standard of a cross-complaint for indemnification against Metropolitan, Trujillo's employer. Standard's theories of indemnification were two, i.e., equitable in that it alleged that Metropolitan was actively and solely negligent in maintaining the unsafe condition which caused the accident and contractual in that Metropolitan had by written contract agreed to perform its service in a non-negligent manner. The trial court sustained, without leave to amend, Metropolitan's demurrer to the cross-complaint and dismissed the cross-complaint. Standard has appealed.

It is readily apparent that if Trujillo, Baltic and Standard each prevailed on their respective complaint and cross-complaints, common

law tort liability for Trujillo's injury would come to rest on Metropolitan in addition to the liability for workmen's compensation benefits already provided. This result would be a circumvention of the rule of exclusivity of the latter remedy.

As early as 1950, the federal courts held that a third party tortfeasor could not seek contribution from an employer whose employee was injured in the course of employment even where the employer was jointly or contributorily negligent. (*American Mut. Liability Ins. Co.* v. *Matthews,* 182 F.2d 322; *Turner* v. *Excavation Construction, Inc.,* 324 F.Supp. 704.) Thus the California rule of *Witt* v. *Jackson,* 57 Cal.2d 57 [17 Cal.Rptr. 369, 366 P.2d 641] is unknown to the federal law. (*Carlson* v. *Pacific Far East Lines,* 29 Cal.App.3d 883 [105 Cal.Rptr. 885].)

The federal law like California law has always permitted the injured employee to maintain an action against a third party tortfeasor (33 U.S.C.A. § 905 [33 U.S.C.S. § 905]) and prior to 1972 in the case of longshoremen covered by the act the usual action was against the vessel being loaded or unloaded. The form of the action was a complaint of unseaworthiness of the vessel, a type of strict liability imposed on the shipowner under maritime law. (*Seas Shipping Co.* v. *Sieracki,* 328 U.S. 85 [90 L.Ed. 1099, 66 S.Ct. 872].)

In 1955, the United States Supreme Court in *Ryan Co.* v. *Pan-Atlantic Corp.,* 350 U.S. 124 [100 L.Ed. 133, 76 S.Ct. 232], ruled that a shipowner held liable under the unseaworthiness doctrine to a longshoreman injured as a result of the negligence of a stevedoring company in loading or unloading a vessel could obtain indemnification for such liability from the stevedoring company, even though such company was the employer of the injured longshoreman. This right to indemnity was based upon the stevedore's contractual obligation to load the vessel safely.

Following the *Ryan* decision it became commonplace for injured longshoremen to institute an action against the vessel which would in turn pass the liability on to the employing stevedore company by way of indemnification. This circular liability approach was credited with frustrating attempts to improve workmen's compensation benefits under the Act.

In order to restore the exclusivity of the workmen's compensation remedy of the employee against his employer and to ameliorate the effect of the *Ryan* rule, the Congress in 1972 subjected the Act to

substantial amendment. The Act as it now reads in pertinent part provides in 33 United States Code Annotated section 905 [33 U.S.C.S. § 905]:

"(a) The liability of an employer prescribed in section 904 [compensation benefits and medical benefits] shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and *anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death,* . . .

"(b) In the event of injury to a person covered under this chapter caused by *the negligence of a vessel,* then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title *and the employer shall not be liable to the vessel for such damages directly or indirectly* and any *agreements or warranties to the contrary shall be* void." (Italics added.)

The effect of these amendments was to (1) make the vessel liable only for its own negligence, thus eliminating actions premised on the unseaworthiness doctrine, (2) prevent the vessel from seeking equitable indemnification or contribution from the employer, and (3) render void as against public policy agreements or contracts by which the employer stevedoring company would indemnify the vessel.

33 United States Code Annotated section 902(21) [33 U.S.C.S. § 902(21)] which was also a part of the 1972 amendments defines "vessel" as follows: "The term 'vessel' means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner *pro hac vice,* agent, operator, charter or bare boat charterer, master, officer, or crew member."

It is undisputed that Standard was a "time charterer" of the ship *Nordland.* As such Standard chartered the use of the ship for a period of time and Baltic provided the crew. Standard points out that there are essentially two types of charters (1) a demise charter, which is identical to the bare boat charter, a term used in the Act, by which the charterer obtains use of the bare ship and mans it with his own crew, and (2) a time charter, a term not used in the Act, whereby the charterer obtains

use of the ship for a specified period of time while the owner maintains control of the ship and provides the crew. (See De Kerchove's Internat. Maritime Dict., (2d ed. 1961) and Civ. Code, § 1959.)

■ Against this background we examine Standard's contention that it is not barred from seeking recovery from Metropolitan because of Standard's status as a "time charterer" as distinguished from other types of charterers. This contention is only made possible by the existence in the federal statute of what both parties concede is a misprint. The misprint is in the use of the word "charter."

Standard contends that the word "charter" cannot be interpreted to include a "time charter." According to Standard the statute, being in derogation of a common law right, must be strictly construed and since the entities enumerated in the statute all are those which are involved with control of the maneuvering, navigation or maintenance of the ship, the doctrine of "expressio unius est exclusio alterius" dictates that "charter" be interpreted to mean "demise charter" which is identical to "bare boat charter." Thus, the argument goes, that because a "time charterer" is not one of those entities which the statute lists as being barred from bringing an action, Standard, being a time charterer, is free to do so. We disagree.

■ The role of the court in interpreting and applying a legislative enactment is to achieve, as nearly as possible, the objective of the Legislature. The various rules and principles of statutory interpretation are simply aids for ascertaining legislative intent.

■ As stated in *Alford* v. *Pierno,* 27 Cal.App.3d 682, at page 688 [104 Cal.Rptr. 110]: "In construing a statute, the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*Select Base Materials* v. *Board of Equal.,* 51 Cal.2d 640 [335 P.2d 672].) . . . The court should take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction."

■ Further, remedial statutes are to liberally construed to effect the remedy intended by the Legislature. (*Viles* v. *State of California,* 66 Cal.2d 24 [56 Cal.Rptr. 666, 423 P.2d 818]; *California Grape etc. League* v. *Industrial Welfare Com.,* 268 Cal.App.2d 692 [74 Cal.Rptr. 313].)

■ Here the legislative objective is clear[1] and Standard's position under the circumstances of this case is in direct conflict with that objective. We believe that Congress intended to break the circle of liability by erecting a barrier between persons identified with the ship and its cargo on the one hand and on the other hand the stevedore who is engaged to load or unload the cargo. Thus the term "vessel" and "charter" should be given the broadest interpretation in effecting the Congressional intent.

[1]Extensive evidence of the intent of Congress is to be found in the Congressional record as follows:

"The end result is that, despite the provision in the Act which limits an employer's liability to the compensation and medical benefits provided in the Act, a stevedore-employer is indirectly liable for damages to an injured longshoreman who utilizes the technique of suing the vessel under the unseaworthiness doctrine.

"The Committee heard testimony that the number of third-party actions brought under the *Sieracki* and *Ryan* line of decisions has increased substantially in recent years and that much of the financial resources which could better be utilized to pay improved compensation benefits were now being spent to defray litigation costs. Industry witnesses testified that despite the fact that since 1961 injury frequency rates have decreased in the industry, and maximum benefits payable under the Act have remained constant, the cost of compensation insurance for longshoremen has increased substantially because of the increased number of third party cases and legal expenses and higher recoveries in such cases.

"Q. How does this bill deal with the problem of circular liability suits and how does it affect the existing remedy of unseaworthiness to which longshoremen are now entitled under the law?

"A. This question goes to one of the most difficult and controversial subjects with which this bill deals. By way of background, I would say that section 5 of the Longshore Act now provides that the liability of the stevedore to pay compensation shall be exclusive and in place of all other liability. However, under law made by the courts in the last twenty-five years, this doctrine of exclusivity has been eroded. Vessels have been held to be liable as third parties for injuries suffered by longshoremen as a result of unseaworthy conditions, even though the unseaworthiness was caused, created, or brought into play by the stevedore or an employee of the stevedore rather than the vessel or any member of its crew. Furthermore, the vessel may recover the damages for which it is liable to the injured longshoremen from the stevedore which employed the longshoreman on the theory that the stevedore has breached an express or implied warranty of workmanlike performance to the vessel. The end result is that despite the provision in the Act which limits an employer's liability to the compensation and medical benefits provided in the Act a stevedore employer is indirectly liable for damages to an injured longshoreman who utilizes the technique of suing the vessel under the unseaworthiness doctrine." (Cong. Rec.—Senate 10-14-72, p. 18274.)

"These circular liability suits have been a very controversial aspect of the present law, and the committee noted that the controversy surrounding them has had the impact of forestalling any improvement in the present Act for over twelve years. The bill before us today deals with this problem in a sound and responsible way. The committee report on this bill explains in some detail the present state of the law and how this bill would correct what is obviously a most unsatisfactory situation." (Cong. Rec.—House, 10-14-72, p. 10044.)

"The committee also believes that the doctrine of the *Ryan* case, which permits the vessel to recover the damages for which it is liable to an injured worker where it can

The factors which distinguish one form of charter party from another do not constitute a rational or logical basis for deciding if liability for the negligence of a person identified with the vessel can be passed on to the stevedore. In other words, the hiring of the crew, and the control over navigation and maneuvering at sea has little to do with liability under circumstances such as are involved in the present case.

Trujillo's claim is based on a single cause of action for negligence. If he is successful in establishing that his injury was the result of negligence on the part of Baltic, then Baltic, as the owner of the ship, could not seek indemnification from Metropolitan. The statute clearly forbids it. Whether Baltic can successfully obtain indemnification from Standard depends on the control which Standard was exercising over the ship at the time of the accident and whether equity dictates that Standard should be the one to bear the liability. Thus as between Baltic and Standard the terms of the charter party and the character of the charter may be significant. If Baltic is successful vis-a-vis Standard, the result would amount to a determination that Standard, by its control of the ship and its conduct[2] occupied a status which Congress clearly intended to be embraced with the definition of "vessel," and the ambit of the prohibition of section 905 of the act, and would thus be barred from attempting on the basis of either equitable or contractual indemnity to

show that the stevedore breaches an expressed or implied warranty of workmanlike performance is no longer appropriate if the vessel's liability is no longer to be absolute, as it essentially is under the seaworthiness doctrine. Since the vessel's liability is to be based on its own negligence, and the vessel will no longer be liable under the seaworthiness doctrine for injuries which are really the fault of the stevedore, there is no longer any necessity for permitting the vessel to recover the damages for which it is liable to the injured worker from the stevedore or other employer of the worker.

"Furthermore, unless such hold-harmless, indemnity or contribution agreements are prohibited as a matter of public policy, vessels by their superior economic strength could circumvent and nullify the provisions of Section 5 of the Act by requiring indemnification from a covered employer for employee injuries.

"Accordingly, the bill expressly prohibits such recovery, whether based on an implied or express warranty. It is the Committee's intention to prohibit such recovery under any theory including, without limitation, theories based on contract or tort.

"Under the proposed amendments the vessel may not by contractual agreement or otherwise require the employer to indemnify it, in whole or in part, for such damages." (1972 U.S. Code, Cong. & Admin. News, No. 3 at pp. 4704-4705.)

[2]Since it appears that Metropolitan was an independent contractor any liability which either Standard or Baltic might suffer because of the actions of Metropolitan would be governed by the special principles set forth in Restatement Second of Torts, sections 413, 416, governing the liability of employers of independent contractors. (Also see *Van Arsdale* v. *Hollinger*, 68 Cal.2d 245 [66 Cal.Rptr. 20, 437 P.2d 508], and *Woolen* v. *Aerojet General Corp.*, 57 Cal.2d 407 [20 Cal.Rptr. 12, 369 P.2d 708].)

pass its liability on to Metropolitan who is already providing benefits as required of it by law.

The judgment of dismissal is affirmed.

Fleming, Acting P. J., and Beach, J., concurred.