[S.F. No. 24496. Sept. 8, 1983.]

DOUGLAS SAND, Petitioner, v.
THE SUPERIOR COURT OF SOLANO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Honeychurch, Finkas & Villarreal and Denis Honeychurch for Petitioner.

No appearance for Respondent.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Thomas A. Brady and Ronald A. Bass, Deputy Attorneys General, for Real Party in Interest.

OPINION

MOSK, J.—Douglas Sand, an indigent criminal defendant, seeks a writ of mandate to compel respondent superior court to grant his motion for public funds to pay for ancillary defense services. He relies on Penal Code section 987.9 in support of his request.[1] For the reasons discussed below, we conclude that the motion was properly denied.

Defendant was charged with assault by a life prisoner causing death (§ 4500), and with murder (§ 187) with special circumstances (§ 190.2, subds. (a)(2) and (a)(15)). He was found to be indigent and an attorney was appointed to represent him. Prior to and during defendant's first trial, his attorney requested and was granted funds pursuant to section 987.9 to pay for the services of an investigator, two experts in the field of prison environment, and jury selection consultants. The jury was unable to reach a verdict and a mistrial was declared. Retrial has been stayed pending our resolution of this proceeding.

At a hearing on defendant's motion for a continuance of his retrial, the prosecutor stated on the record that he would not seek the death penalty, but would ask for a sentence of life imprisonment without possibility of parole in the event special circumstances were proved. Defendant, through his attorney, then moved for additional funds under section 987.9 to assist in the second trial. The court denied the motion on the ground that defendant's prosecution was no longer a "capital case" because the death penalty could not be imposed. Defendant contends that his case remains "capital" because special circumstances have been alleged.

Section 987.9 provides in part that "In the trial of a capital case the indigent defendant, through his counsel, may request the court for funds

---

[1] All statutory references are to the Penal Code.

for the specific payment of investigators, experts, and others for the preparation or presentation of the defense." We are asked to construe the phrase "capital case" as used in this provision.

■ Initially, we examine the words at issue to determine whether their meaning is ambiguous. (*Smith* v. *Rhea* (1977) 72 Cal.App.3d 361, 365 [140 Cal.Rptr. 116].) ■ The word "capital," when used to modify "punishment," is unambiguous: capital punishment means punishment by death. However, defendant contends that the phrase "capital *case*" should be construed more broadly to include any prosecution in which death is a statutorily permissible punishment; thus, a "capital case," in defendant's view, is any case in which special circumstances have been alleged, regardless of whether the prosecutor has stipulated that the death penalty will not in fact be sought.

Arguably the term "capital case" might be understood either to define the nature of the offense charged—i.e., murder with special circumstances—or to describe the permissible punishment—i.e., that the death penalty may be imposed. ■ This ambiguity invites statutory construction: "Where language [of a statute] is susceptible of more than one meaning, it is the duty of the courts to accept that intended by the framers of the legislation, so far as its intention can be ascertained." (*Stillwell* v. *State Bar* (1946) 29 Cal.2d 119, 124 [173 P.2d 313].) ■ In *Select Base Materials, Inc.* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672], this court reiterated that "The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (Accord, *West Pico Furniture Co.* v. *Pacific Finance Loans* (1970) 2 Cal.3d 594, 607 [86 Cal.Rptr. 793, 469 P.2d 665]; *People* v. *Superior Court (Smith)* (1969) 70 Cal.2d 123, 132 [74 Cal.Rptr. 294, 449 P.2d 230]; *Standard Fruit and Steamship Co.* v. *Metropolitan Stevedore Co.* (1975) 52 Cal.App.3d 305, 310 [125 Cal.Rptr. 111].) To discern legislative intent, we must examine the legislative history and statutory context of the act under scrutiny. (*Cossack* v. *City of Los Angeles* (1974) 11 Cal.3d 726, 732 [114 Cal.Rptr. 460, 523 P.2d 260]; *English* v. *County of Alameda* (1977) 70 Cal.App.3d 226, 233-234 [138 Cal.Rptr. 634]; *Steilberg* v. *Lackner* (1977) 69 Cal.App.3d 780, 785 [138 Cal.Rptr. 378].)

■ We begin this exercise by observing that the Legislature expressly conditioned the effectiveness of section 987.9 (Stats. 1977, ch. 1048, § 2, p. 3179) on passage of the 1977 death penalty legislation (Stats. 1977, ch. 316, §§ 4-14, pp. 1256-1262). Therefore we must consider section 987.9 in the context of this broader statutory scheme. (*Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 489 [134 Cal.Rptr. 630, 556 P.2d 1081];

*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33].)

Former sections 190 through 190.4 of the 1977 legislation provided that when a defendant is charged with murder and special circumstances are alleged the trial shall proceed in two phases. In the first or guilt phase the trier of fact must determine whether the defendant is guilty of the offense and, if so, whether the special circumstances have been proved. In the second or penalty phase the trier of fact must determine whether the sentence of death or of life imprisonment without possibility of parole should be imposed. Nowhere is the term "capital case" defined, and no distinction relevant for purposes of construing section 987.9 is made between death and life imprisonment without parole. However, because the ultimate purpose of the 1977 statute was to reinstate the death penalty, we may reasonably conclude that its companion section 987.9 was intended to insure that in cases in which the defendant actually risks death he or she will be afforded such ancillary defense services as are necessary to a "complete and full defense."

This construction of "capital case" is compatible with the following statement by the Legislature explaining why the enactment both of the death penalty statute and of section 987.9 was an urgency measure: "The California Supreme Court has declared the existing *death penalty law* unconstitutional. This act remedies one aspect of the constitutional infirmities found to be in existing law, and in order to guarantee the public the protection inherent in an operative *death penalty law,* it is necessary that this act takes effect immediately." (Italics added.) (Stats. 1977, ch. 1048, § 4, p. 3179; *id.,* ch. 316, § 26, p. 1266.) By explicitly linking enactment of section 987.9 to passage of a statutory scheme denominated a "death penalty law" the Legislature has expressed its intention that the defense services funding provision apply in those cases in which death remains a possible punishment. (See *Criminal Procedure: Investigation and Presentation Funds in Capital Cases* (1978) 9 Pacific L.J. 454-455.)

Furthermore, had the Legislature intended section 987.9 to apply when either the death penalty *or* the sentence of life imprisonment without possibility of parole might be imposed, it could readily have said so explicitly, as it has done elsewhere. For example, section 1018, reenacted in 1977 as part of the death penalty law (Stats. 1977, ch. 316, § 17, p. 1263), provides in part that "No plea of guilty of a felony for which the maximum punishment is *death, or life imprisonment without the possibility of parole,* shall be received from a defendant who does not appear with counsel, nor shall any such plea be received without the consent of the defendant's counsel." (Italics added.) Section 987.9, in contrast, provides for ancillary defense

funds in "capital cases" only—i.e., only when the death penalty may be imposed.

In those murder cases, such as that of defendant, in which the death penalty will not be sought, even though the offense charged is statutorily punishable by death, section 987.9 is inapplicable. If defendant is found guilty of first degree murder with special circumstances he will be sentenced to life imprisonment without parole. Because he does not risk capital punishment, his is not a "capital case" within the meaning of section 987.9 as construed in light of the 1977 death penalty statute.[2]

Our conclusion that this is not a "capital case" because the death penalty may not be imposed is consistent with United States Supreme Court decisions holding that the death penalty is fundamentally and qualitatively different from any other punishment, including life without parole. The Supreme Court equated "capital" with "death penalty" in *Woodson* v. *North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978]: in striking down a North Carolina mandatory death penalty statute the *Woodson* court held that the Eighth Amendment requires individualized sentencing in "capital cases," and then explained that "This conclusion rests squarely on the predicate that *the penalty of death* is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." (Italics added; *id.* at p. 305 [49 L.Ed.2d at p. 961] [plurality opn.]; accord, *Gregg* v. *Georgia* (1976) 428 U.S. 153, 187 [49 L.Ed.2d 859, 882-883, 96 S.Ct. 2909] [plurality opn.]; see also *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 428 [134 Cal.Rptr. 650, 556 P.2d 1101].)

Our views are also supported by the recent decision in *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108]. In *Keenan* a defendant charged with murder with special circumstances sought funds under section 987.9 to pay for the services of a second attorney. Although we ultimately granted the request under section 987, subdivision (b), which provides for court-appointed counsel in capital cases, we also relied on section 987.9 because "The wording of section 987.9, together with its legislative history, lead us to conclude that it was intended to supplement

---

[2]A contrary interpretation would lead to an absurd result in certain cases. Under Penal Code section 209, subdivision (a), a person convicted of kidnaping "shall be punished by imprisonment in the state prison for life without possibility of parole in cases in which any person subjected to any such act [of kidnaping] suffers death *or bodily harm, or is intentionally confined in a manner which exposes such person to a substantial likelihood of death* . . . ." (Italics added.) In a kidnaping case in which the victim was physically hurt or placed in mortal danger, but in fact survived, the defendant surely could not claim that because the penalty would be life without parole his was a "capital case" within the meaning of section 987.9.

preexisting provisions for employment of defense counsel at public expense by making provision for services ancillary to those of counsel." (*Id.* at p. 430.) We implicitly construed the provision of section 987.9 for ancillary defense services in "capital cases" to apply to cases involving the death penalty. In describing the factors a trial court should weigh in deciding whether to grant a request for funds for a second attorney in such cases, we observed: "The United States Supreme Court has expressly recognized that death is a different kind of punishment from any other, both in terms of severity and finality. Because life is at stake, courts must be particularly sensitive to insure that every safeguard designed to guarantee defendant a full defense be observed." (*Id.*, at p. 430.)

Additionally, our discussion in *Keenan* of the complexity of criminal defense litigation as an additional factor to be considered by the trial court in determining whether to grant a defendant's request features language that clearly defines a "capital case" as one in which the death penalty may be imposed: "In a murder prosecution that is factually and legally complex, the task of effectively preparing for trial places a substantial burden on the defense attorney. This is particularly true of a *capital case*, since *the possibility of a death penalty* raises additional factual and legal issues." (Italics added; *id.*, at pp. 431-432.) Specifically, we were persuaded by the defendant's argument that the difficulty of preparing his case for trial "was compounded . . . by the inherent problem present in any *capital case* of simultaneous preparation for a guilt and a penalty phase of the trial. [Counsel] noted that the issues and evidence to be developed in order to support mitigation of the *possible death sentence* were substantially different from those likely to be considered during the guilt phase." (Italics added; *id.*, at p. 432.)

Here, by contrast, because the death penalty cannot be imposed no penalty phase will take place. If defendant is found guilty of murder and the alleged special circumstances are proved true, he will be sentenced automatically to life imprisonment without possibility of parole. Thus one of the justifications for affording ancillary defense services to defendants in "capital cases"—i.e., to assist in preparation of the additional penalty phase—is absent in the matter at bar.

Defendant contends that his case is analogous to *Ramos* v. *Superior Court* (1982) 32 Cal.3d 26 [184 Cal.Rptr. 622, 648 P.2d 589]. In addition to arguing that the special circumstance allegation was barred under section 1387, the defendant in *Ramos* claimed that the prosecutor had introduced insufficient evidence in support of the allegation. The superior court believed the power to dismiss special circumstance allegations under sections 871 and 995 was limited to special circumstance cases in which the death

penalty was sought. Because the district attorney had stated he would not seek the death penalty against Ramos, the court concluded that the adequacy of the evidence in support of the special circumstance allegation was not subject to review.

This court rejected the distinction between death penalty and life without parole cases, but carefully and explicitly limited its holding: "In our view, the court erred in drawing a distinction—*in this context*—between special circumstance cases in which the People are seeking the death penalty and those in which the defendant only faces a potential punishment of life without possibility of parole. . . . [¶] . . . If, as is conceded, the sufficiency of evidence underlying a special circumstance allegation may always be tested in superior court under section 995, we see no purpose to be served in *construing section 871 to preclude the magistrate from making this reasonable cause determination concurrently with his evaluation of the adequacy of the evidence with respect to the remainder of the charges.*" (Italics added; *id.,* at pp. 33-34.) Neither section 871 nor section 995 deals explicitly with "capital cases," nor is either provision linked with the death penalty statute enacted concurrently with section 987.9. Although no statutory language or legislative history exists to warrant limitation of these provisions to death penalty cases, we do find ample evidence of legislative intent to limit section 987.9 to cases in which the death penalty may be imposed.

Defendant next directs our attention to *In re Freeman* (1980) 102 Cal.App.3d 838 [162 Cal.Rptr. 423]. Freeman was charged with murder with special circumstances. The prosecuting attorney promised he would not seek the death penalty and the defendant signed a written waiver of the penalty phase of his trial. The defendant then petitioned for habeas corpus seeking bail; he argued that although bail may be denied in capital cases, his was no longer a capital case because the death penalty could not be imposed. The court rejected the argument, declaring that it did "not find it necessary to discuss the nature or effect of the appellant's agreement with the district attorney or whether it is binding on the court . . . ." (*Id.,* at p. 840, fn. 2.) Instead, the court focused exclusively on the nature of the offense charged and stressed there was "nothing in the record to show that any promise has been made by anyone to change the charge . . . ." (*Id.,* at p. 840.)

Whatever the merits of the Court of Appeal's approach in *Freeman* of focusing exclusively on the offense charged rather than considering as well the potential punishment, the bail situation is distinguishable. Section 987.9 was enacted simultaneously with the 1977 death penalty statute to ensure that defendants in "capital cases" be afforded ancillary defense services because of the gravity of the *punishment* they risk. Whether the Legislature

intended, by enacting sections 1268a and 1270, to deny bail to persons charged with "capital offenses" but not in fact subject to the death penalty is not a question presently before us.

The Legislature's provision of special funding in "capital cases" reflects a belief that ancillary defense services may be needed both because of the inherent difficulty of preparing for a murder trial and because of the gravity of the potential penalty. In construing the scope of "capital cases" we must give weight to these same concerns. A defendant charged with a "capital offense," i.e., murder with special circumstances, may suffer the death penalty if the special circumstance allegations are proved true and if, at the penalty phase, the jury determines that the penalty is appropriate. However, when the prosecuting attorney stipulates that the death penalty will not be sought, as here, the defendant need not prepare for a penalty phase and no longer risks capital punishment. Because the defendant will not be sentenced to death, his case is no longer capital for purposes of section 987.9 funding. Defendant's request under this provision was therefore properly denied.

We observe, however, that defendant may be able to secure equivalent relief by alternate means. He may invoke his statutory right to legal assistance, which has recently been defined by the Legislature to include necessary defense services.[3] ■ Moreover, both state and federal decisions have recognized that the right to counsel and to due process may include the right to expert and investigative services.[4] Thus although state resources allocated pursuant to section 987.9 for "capital cases" are not available to this defendant, he has the right to petition the trial court for public funds.[5] Indeed, he has already received some funds, but has been denied others, for such services.

The alternative writ of mandate is discharged and the peremptory writ is denied.

---

[3]Section 987, subdivision (a), provides for court appointment of counsel in noncapital cases; section 987.8, subdivision (f)(1), provides that, based on a defendant's present ability to pay, he may be required to reimburse the court for "legal assistance" provided, and further defines "legal assistance provided" to include: "legal counsel and supportive services including, but not limited to, medical and psychiatric examinations, *investigative services, expert testimony,* and *any other form of services provided to assist the defendant in the preparation and presentation of defendant's case.*" (Italics added.)

[4]For the proposition that the right to counsel includes the right to effective counsel, and thus to ancillary defense services, see *In re Ketchel* (1968) 68 Cal.2d 397, 399-400 [66 Cal.Rptr. 881, 438 P.2d 625]; *People* v. *Faxel* (1979) 91 Cal.App.3d 327, 330 [154 Cal.Rptr. 132]; *Mason* v. *State of Arizona* (9th Cir. 1974) 504 F.2d 1345, 1351. To avoid disclosure of defense strategy, *Puett* v. *Superior Court* (1979) 96 Cal.App.3d 936 [158 Cal.Rptr. 266], provides that the defendant may make his showing at an *in camera* hearing outside the presence of the prosecutor. (*Id.,* at p. 940, fn. 2.)

[5]Because defendant was charged with committing a crime while in state prison, any county funds awarded to him by the trial court for preparation of his case would be reimbursed by the state. (Pen. Code, § 4700.)

Richardson, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**BIRD, C. J.**—I dissent from the very limited interpretation the majority have given to the term "capital case" in Penal Code section 987.9.[1] In my view, the Legislature clearly intended to make the benefits of that statute available to individuals charged with murder whenever special circumstances are alleged, whether or not the prosecution is seeking the death penalty.

In restricting section 987.9's application to "death penalty" cases, the majority ignore several decisions of this court in which such a narrow reading has been expressly rejected. Furthermore, as a practical matter, the majority's holding will saddle the counties with the financial responsibility for ancillary defense services in special circumstances cases in which the death penalty is not sought. This will create insuperable problems and precipitate the very local financial crises which the Legislature sought to prevent by enacting section 987.9.

The sole question in this case is what the Legislature intended when it accorded the benefits of section 987.9[2] to indigent defendants "[i]n the trial of a capital case . . . ." It is not what the term "capital case" might mean to the populace at large, or even whether that term is synonymous with "capital punishment." When section 987.9 is viewed in the context of the overall statutory scheme of which it is a part, it becomes clear that the Legislature intended all individuals charged in special circumstances cases to receive the benefits of that statute.

I.

A proper understanding of the connection between section 987.9 and the special circumstances scheme requires a brief review of the history of special circumstances legislation in this state.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] Section 987.9 provides: "In the trial of a capital case the indigent defendant, through his counsel, may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense. The application for such funds shall be by affidavit and shall specify that the funds are reasonably necessary for the preparation or presentation of the defense. The fact that such an application has been made shall be confidential and the contents of the application shall be confidential. Upon receipt of such application, a judge of the court, other than the trial judge presiding over the capital case in question, shall rule on the reasonableness of the request and shall disburse an appropriate amount of money to defendant's attorney. The ruling on the reasonableness of the request shall be made at an in camera hearing. In making such a ruling, the court shall be guided by the need to provide a complete and full defense for the defendant. [¶] At the termination of the proceedings, the attorney shall furnish to the court a complete accounting of all moneys received and disbursed pursuant to this section."

Our Legislature first enacted special circumstances legislation in 1973 as a response to a United States Supreme Court decision which had declared the Georgia death penalty statute unconstitutional. (See *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726].) Since the existing California death penalty scheme was substantially the same as the Georgia statute involved in *Furman,* the 1973 legislation was an attempt to meet the objections raised in that case. (See *People* v. *Frierson* (1979) 25 Cal.3d 142, 174 [158 Cal.Rptr. 281, 599 P.2d 587] (lead opn. of Richardson, J.).) Operating under the belief that the Supreme Court required a mandatory death penalty law that would apply to a narrow class of first degree murderers, the Legislature provided for a supplementary finding of "special circumstances" following an individual's conviction of first degree murder. (See former § 190.2, Stats. 1973, ch. 719, § 5, p. 1299.) In all cases where special circumstances were found true, the penalty was automatically fixed at death. (See former §§ 190, 190.1, 190.2, Stats. 1973, ch. 719, §§ 2, 4, 5, pp. 1297-1300.)

Subsequent Supreme Court decisions invalidated two mandatory death penalty laws which were similar to California's.[3] According to the Supreme Court, the vice of those schemes was a failure to provide the "sentencing authority with the option to impose a sentence other than death, guided by sufficient standards to assure against arbitrariness and discrimination in the application of the death penalty." (*People* v. *Frierson, supra,* 25 Cal.3d at p. 174 (lead opn.).) Relying on those decisions, this court found the 1973 law unconstitutional. (*Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101].)

The 1977 Legislature responded to our *Rockwell* decision by enacting Senate Bill No. 155. (1977-1978 Reg. Sess.; Stats. 1977, ch. 316.) That legislation "adopted an essentially new system whereby the trier of fact, upon proof of certain enumerated 'special circumstances' . . . , must determine whether the penalty shall be death or life imprisonment without possibility of parole . . . ." (*People* v. *Frierson, supra,* 25 Cal.3d at p. 175; see former §§ 190, 190.2, 190.3, 190.4, Stats. 1977, ch. 316, §§ 5, 9, 11, 12, pp. 1256-1262.) Although the Legislature reenacted the death penalty in murder-special circumstances cases, the most important aspect of the 1977 legislation was its provision for a penalty alternative to death in such cases.

---

[3]The high court struck down the laws of North Carolina and Louisiana (*Woodson* v. *North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978]; *Roberts* v. *Louisiana* (1976) 428 U.S. 325 [49 L.Ed.2d 974, 96 S.Ct. 3001]), and upheld the discretionary death penalty statutes of Georgia, Florida, and Texas (*Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909]; *Proffitt* v. *Florida* (1976) 428 U.S. 242 [49 L.Ed.2d 913, 96 S.Ct. 2960]; *Jurek* v. *Texas* (1976) 428 U.S. 262 [49 L.Ed.2d 929, 96 S.Ct. 2950]).

The same Legislature which enacted Senate Bill No. 155 also added section 987.9 to the Penal Code. (Stats. 1977, ch. 1048, § 1, p. 3178.) Indeed, the close connection between the enactments is shown by the fact that the operation of section 987.9 was expressly conditioned on the passage of Senate Bill No. 155. (See *id.*, § 2, p. 3179.)

It is, therefore, significant that the Legislature did not limit the applicability of section 987.9 to "death penalty" cases, but extended its benefits to "capital" cases. The use of this broader term can only mean that the Legislature intended section 987.9 to apply to the type of cases with which Senate Bill No. 155 was primarily concerned, i.e., special circumstances cases. Since the main feature of these 1977 legislative enactments was the addition of the alternative penalty of life without parole, it follows that the Legislature intended to accord the benefits of section 987.9 to all persons accused of special circumstances crimes, regardless of whether the penalty being sought was death or the newly created alternative of life without parole.[4]

Several of this court's decisions regarding other aspects of the special circumstances statutory scheme reinforce the conclusion that the term "capital case," as it is used in section 987.9, refers to all cases in which special circumstances are alleged.

*People* v. *Davis* (1981) 29 Cal.3d 814 [176 Cal.Rptr. 521, 633 P.2d 186] is such a case. There, a 16-year-old minor was convicted under the 1977 law of murder with special circumstances. Since that legislation specifically exempted minors from the death penalty (see former § 190.5, Stats. 1977, ch. 316, § 13, p. 1262), the minor was automatically sentenced to life without the possibility of parole. On appeal, he argued that the Legislature intended the latter penalty to apply only as an alternative in special circumstances cases in which the former penalty could statutorily be imposed. This court agreed and ordered the minor's sentence reduced to life imprisonment. (*Id.*, at p. 832.)

The analysis in *Davis* indicates that this court views the 1977 legislation as a system of two alternative penalties which are linked for purposes of statutory interpretation. The conclusion that the Legislature had intended to proscribe life without possibility of parole for minors in special circumstan-

---

[4]The majority fear that individuals charged with aggravated kidnaping (§ 209, subd. (a))—who face a term of life without possibility of parole—would be entitled to the benefits of section 987.9. (Maj. opn., *ante*, at p. 576, fn. 2.) This belief is unfounded. Under a proper construction of the statute, "capital case" refers to a special circumstance case. Since aggravated kidnaping is not such a case, there is no possibility that the state will be financially liable for ancillary defense services when that crime is charged.

ces cases was a clear recognition that the 1977 law was not merely a "death penalty" statute, but rather a "special circumstances" statute. Because the two penalties were statutorily linked, the statutory prohibition of one necessarily rendered the other inapplicable. Since section 987.9 was part of the same special circumstances scheme at issue in *Davis,* the Legislature's decision to confer its benefits on all individuals accused in "capital cases" must be read as intending to apply to individuals subject to either penalty. According the benefits of section 987.9 in all special circumstances cases is thus consistent with the *Davis* holding.

This court's analysis in *Ramos* v. *Superior Court* (1982) 32 Cal.3d 26 [184 Cal.Rptr. 622, 648 P.2d 589] is similarly illustrative. The trial court there had ruled that a motion to dismiss a special circumstance allegation—made under section 871 in the municipal court and under section 995 in the superior court—did not lie to challenge the evidentiary sufficiency of a special circumstance allegation where the death penalty was not being sought.[5] In reversing that ruling, this court rejected the contention that the Legislature sought to distinguish between special circumstances cases involving the death penalty and those limited to life without the possibility of parole. The court noted that "[n]othing in either the statutory language or legislative history of either the current death penalty statutes or of section 995 indicates that the Legislature intended to limit the review of special circumstance allegations [to cases in which the death penalty is sought]." (32 Cal.3d at p. 33.)

The majority's attempt to distinguish this holding by emphasizing that *Ramos* only dealt with the "context" of review of special circumstances allegations under sections 871 and 995 misses the point. (Maj. opn., *ante,* pp. 573-574; see *Ramos* v. *Superior Court, supra,* 32 Cal.3d at p. 33.) *Ramos* is apposite here because it demonstrates this court's recognition that in yet another situation where special circumstances are involved, the Legislature intended to make no distinction between cases where death is a possibility and those where it is not. It is irrelevant that *Ramos* arose in the "context" of the review powers provided in sections 871 and 995, since the same overall legislative scheme is involved. If this court is to be consistent with its prior decisions in this area, the conclusion is inevitable that the Legislature intended to draw no distinction among special circumstances cases when it enacted section 987.9.

Like the Legislature in enacting section 987.9, this court itself has used the term "capital case" to include more than "death penalty cases." A

---

[5]At the time of the trial proceedings in *Ramos,* it was clear that the sufficiency of evidence to support a special circumstance allegation in death penalty cases could be tested under section 995. (See *Ramos, supra,* 32 Cal.3d at pp. 29-30, 32-33; *Ghent* v. *Superior Court* (1979) 90 Cal.App.3d 944, 953-954 [153 Cal.Rptr. 720].)

perfect example is our decision in *People* v. *Chadd* (1981) 28 Cal.3d 739 [170 Cal.Rptr. 798, 621 P.2d 837]. The issue in *Chadd* was whether the trial court erred in accepting, without the consent of counsel, an accused's plea to first degree murder with special circumstances. On appeal, this court held the plea was invalid in view of the provision in section 1018 that "[n]o plea of guilty of a felony for which the maximum punishment is death, or life imprisonment without the possibility of parole, shall be received from a defendant who does not appear with counsel, nor shall any such plea be received without the consent of the defendant's counsel."[6]

Writing for this court, Justice Mosk analyzed the requirements of section 1018, noting that "it is difficult to conceive of a plainer statement of law than the rule of section 1018 that no guilty plea to a *capital offense* shall be received 'without the consent of the defendant's counsel.'" (*Id.*, at p. 746, italics added.) Acknowledging that another provision of section 1018 permits "*noncapital* defendants" to plead guilty without counsel, Justice Mosk reasoned that "to permit a capital defendant [to do so] . . . would thus obliterate the Legislature's careful distinction between *capital and non-capital cases,* and render largely superfluous its special provision for the former." (*Id.*, at p. 747, last italics added.) Later in the opinion, Justice Mosk discussed whether *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] was inconsistent with the counsel requirement in section 1018, and stated that *Faretta* "did not strip our Legislature of the authority to condition guilty pleas in *capital cases* on the consent of defense counsel." (28 Cal.3d at p. 750, italics added.) Since section 1018 proscribes counselless pleas not only in "death penalty" cases, but in all cases where death *or* life without the possibility of parole is a potential punishment, the *Chadd* court's repeated characterization of such cases as "capital" demonstrates how that term can embrace nondeath penalty cases. Further, that definition is entirely consistent with the meaning the Legislature intended to give that term in section 987.9.[7]

---

[6]The provision requiring counsel's consent was added in 1973. (Stats. 1973, ch. 719, § 11, p. 1301.) Although section 1018 was amended in other respects in the 1977 legislation which added the life without parole penalty to the special circumstances scheme (Stats. 1977, ch. 316, § 17, p. 1263), the language quoted in the text remained intact.

[7]Even assuming the majority are correct in asserting that the term "capital case" in section 987.9 is ambiguous (see maj. opn., *ante,* at p. 570), it is difficult to justify the conclusion it reaches.

It is a well established principle of statutory construction that "'[t]he defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute.'" (*People* v. *Davis, supra,* 29 Cal.3d at p. 828, quoting *In re Tartar* (1959) 52 Cal.2d 250, 256-257 [339 P.2d 553].)

Thus, if, as the majority believe, the term "capital case" is reasonably susceptible to two constructions, then the definition which favors petitioner must be adopted. (*Ibid.*) This principle compels the conclusion that the benefits of state funding and confidentiality which the Legislature provided for in section 987.9 must be extended to all individuals charged with special circumstances, whether or not the death penalty will be sought.

## II.

When a trial court awards funds pursuant to section 987.9, the state reimburses the counties for the expenditures. (See maj. opn., *ante,* at p. 575; Rev. & Tax. Code, § 2231;[8] *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424, 429 [180 Cal.Rptr. 489, 640 P.2d 108].) Expenditures for ancillary defense services in cases where an award has not been made pursuant to section 987.9 are borne by the county. Thus, the practical effect of today's decision is to place the financial burden for ancillary defense services in nondeath penalty special circumstances cases on the counties. Because the counties already bear the major burden for the cost of appointed *counsel* in all criminal cases (see § 987.6; *Keenan, supra,* 31 Cal.3d at pp. 429-430), the effect of today's decision is potentially devastating.

Assuming, as the majority do, that an accused in a nondeath penalty special circumstances case is entitled to ancillary defense services equivalent to those contemplated by section 987.9 (see maj. opn., *ante,* at p. 575, and fns. 3 & 4), the payment for such services will be dependent upon the ability of a county government to authorize the expenditure of its resources. Because the cost of those services can be quite high, in less-populated counties with relatively small budgets there will be an inevitable tug-of-war between the accused's right to such services and the county's desire to keep itself solvent.

For example, it is not at all inconceivable that a county which has been ordered to pay for an accused's ancillary defense services will refuse to do so on the ground that the expenditure would bankrupt its treasury. This could result in a stalemate between the local judiciary and county officials, thereby requiring a special legislative appropriation or a resolution by the appellate courts. If the counties are saddled with the expense of ancillary defense services in nondeath penalty special circumstances trials, and if, as the majority hold, individuals so charged are entitled to such services, then such a scenario is likely to become commonplace. I cannot concur in an interpretation of section 987.9 which will encourage such a result.

No local official should be placed in a position of having the responsibility or the power to condition an accused's right to a full and fair defense on the size of the county fisc. In enacting section 987.9, the Legislature ob-

---

[8]Subdivision (a) of Revenue and Taxation Code section 2231 provides in relevant part: "The state shall reimburse each local agency for all 'costs mandated by the state,' as defined in section 2207." Section 2207 states in relevant part: " 'Costs mandated by the state' means any increased costs which a local agency is required to incur as a result of the following: [¶] (a) Any law enacted after January 1, 1973, which mandates a new program or an increased level of service of an existing program. . . ."

viously considered this problem and resolved it by an annual appropriation[9] for defense services in special circumstances trials. Those monies should be available to any individual charged with murder where special circumstances are alleged. Today's decision only assures that the practical problems associated with county funding of special circumstances trials will occur with increasing regularity.

## III.

Finally, I find the majority's disposition in this case very puzzling. As noted, the majority observe that petitioner may be able to secure "by alter nate means" relief equivalent to that claimed under section 987.9. Those means, according to the majority, emanate from petitioner's "statutory right to legal assistance" (§§ 987, subd. (a); 987.8) and his rights to counsel and due process. (*In re Ketchel* (1968) 68 Cal.2d 397, 399-400 [66 Cal.Rptr. 881, 438 P.2d 625]; *People* v. *Faxel* (1979) 91 Cal.App.3d 327, 330 [154 Cal.Rptr. 132]; maj. opn., *ante,* at p. 575, and fns. 3 & 4.) However reassuring that dicta may be in other cases, the majority do not grant peti tioner such funds by these "alternate means." That result is curious, given this court's recent decision in *Keenan* v. *Superior Court, supra,* 31 Cal.3d 424.

In *Keenan,* the indigent petitioner applied to the superior court for funds under section 987.9 to hire a second counsel. The trial court denied his request. This court held that petitioner had made a sufficient showing to support his claim (*id.,* at p. 427), but found section 987.9 inapplicable on the ground that the statute is intended to provide only for ancillary defense services, not counsel.[10] Holding that the funds could be awarded pursuant

---

[9]Appropriations for section 987.9 monies have increased over the last few budget years, which may indicate that the Legislature recognizes the important function that the availability of these funds serves. The 1980 Budget Act appropriated $1 million for disbursement under section 987.9. (Stats. 1980, ch. 510, p. 1237.) The same sum was appropriated in the 1981 Budget Act (Stats. 1981, ch. 99, p. 540), but proved to be insufficient for fiscal year 1981-1982, and a supplemental appropriation of $1.19 million was made (Stats. 1982, ch. 1586, § 5(k), p. 6267). That sum still fell short of actual expenditures by some $800,000. (See Legis. Analyst's Rep., 1983 Budget, Item No. 8160, pp. 1783-1784.) The sum of $1 million was again appropriated in the 1982 Budget Act (Stats. 1982, ch. 326, p. 1043), but a sup plemental appropriation of $2.47 million appears necessary to cover actual expenses for fiscal year 1982-1983. (See Legis. Analyst's Rep., *supra,* at p. 1784.)

[10]The majority make the surprisingly inaccurate assertion that this court in *Keenan* "im plicitly construed . . . section 987.9 . . . to apply to cases involving the death penalty." (Maj. opn., *ante,* at p. 575.) As the *Keenan* opinion indicates, the petitioner applied for funds for a second counsel under section 987.9. This court found section 987.9 inapplicable, because the statute provides only for funds for services ancillary to those of counsel, not for counsel itself. (See *id.,* at p. 430.) Thus, this court neither explicitly nor implicitly construed that statute to be inapplicable in nondeath penalty cases.

to other statutes,[11] this court then ordered that a peremptory writ issue directing the trial court to grant petitioner's request under the alternate statutory provisions. (*Id.*, at p. 434.)

The instant case is in a posture identical to that of *Keenan*. Petitioner has sought funds under section 987.9. According to the majority, those funds are not available under that statute, but petitioner is said to be entitled to equivalent relief under "alternate means." Why, then, is this petitioner not granted relief in the same manner as in *Keenan,* i.e., under these "alternate means"?

## IV.

As this court has recently recognized, "[r]epresentation of an accused murderer is a mammoth responsibility." (*In re Hall* (1981) 30 Cal.3d 408, 434 [179 Cal.Rptr. 223, 637 P.2d 690].) While a special circumstances case in which the death penalty is no longer a possibility may be less of a "mammoth responsibility" than one in which it is, the difference may be negligible. A denial of state-provided ancillary defense funds in nondeath penalty special circumstances cases may deprive the accused of the tools necessary for a full and complete defense. Since the majority's result is contrary to the Legislature's provision, and since the practical problems associated with burdening the counties with the expense of such cases are potentially devastating, I must respectfully dissent.

---

[11]The statutes referred to (§§ 987, subd. (b), 987.2-987.8; *Keenan, supra,* 31 Cal.3d at pp. 429-430) provide for payment of counsel for indigent persons accused of a crime or detained under the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.). In such cases, the state reimburses the counties for 10 percent of such costs. (See § 987.6.)