[S.F. No. 24521. Sept. 8, 1983.]

FREDRICK WINFIELD WILLIAMS, Petitioner, v.
THE SUPERIOR COURT OF PLACER COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

Robert J. Trombley, Public Defender, and Thomas W. Condit for Petitioner.

No appearance for Respondent.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian and Daniel J. Kremer, Chief Assistant Attorneys General, Arnold O. Overoye, Assistant Attorney General, Charles P. Just and David De Alba, Deputy Attorneys General, for Real Party in Interest.

## OPINION

**BROUSSARD, J.**—Shortly after dawn on June 12, 1980, the body of a young white woman, Heather Mead, age 22, was found on Industrial Ave-

nue near Roseville in Placer County. A few days later, Kenneth Williams, a young black man, was arrested in connection with the homicide, and charged with murder with special circumstances, rape, burglary, kidnaping, kidnaping for robbery and robbery. After Kenneth was arraigned, his brother Fredrick (defendant herein) was arrested and identically charged. Preliminary examinations were held and both were bound over for trial. Because it appeared likely that Kenneth and not defendant had been the triggerman, Kenneth was denied bail and defendant was released on $10,000 bail.

The trials were severed and Kenneth was tried first. His 10-month-long trial began in May 1981 and resulted in conviction on all counts in March 1982. The jury selected the death penalty in April 1982.

While Kenneth was on trial, defendant was twice arrested, once for burglary and once for assault with a deadly weapon. Both charges were eventually dismissed and defendant has remained on bail.

Several months ago, the deputy district attorney indicated to the trial court that he would not seek the death penalty against defendant, but would seek life without possibility of parole. Defendant nevertheless sought capital funds under Penal Code section 987.9. The trial court, concluding that the case was no longer "capital," denied the request. At the same hearing, defendant moved for a change of venue due to prejudicial pretrial publicity. This motion was also denied. Defendant then sought extraordinary relief to compel the trial court to provide the section 987.9 funds and to change the venue for purposes of trial. We issued an alternative writ of mandate.

The issue whether defendant, facing only life without the possibility of parole, is nevertheless eligible for capital funds under Penal Code section 987.9 has already been answered in the negative in *Sand* v. *Superior Court,* (1983) *ante,* page 567 [194 Cal.Rptr. 480, 668 P.2d 787]. We have chosen, however, to issue a peremptory writ to compel the trial court to grant a change of venue in this case.[1]

### DISCUSSION

Between June 1980 and June 1982, extensive media coverage was given to the progress of the proceedings against the two Williams brothers. During that time span, 159 different items appeared. Nearly every item mentioned both brothers and the fact that they were charged with the murder of Heather

---

[1]Defendant has lodged a transcript of the proceeding under protest. He claims that this transcript should not be reviewed because our determination of the change of venue issue requires an independent review of the evidence. We disagree. A transcript of a hearing may include testimony or arguments and thus may be relevant.

Mead. Defendant contends that the dissemination of this material is potentially prejudicial, and he therefore cannot receive a fair trial in Placer County.

■ In *Maine* v. *Superior Court* (1968) 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372], we adopted the comprehensive standards outlined in the Reardon Report for determining when a change of venue is properly required: "'A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. This determination may be based on such evidence as qualified public opinion surveys or opinion testimony offered by individuals, or on the court's own evaluation of the nature, frequency and timing of the material involved. A showing of actual prejudice shall not be required.'" (P. 383; fn. omitted.) "The phrase 'reasonable likelihood' denotes a lesser standard of proof than 'more probable than not.' [Citation.] Further, when the issue is raised before trial, any doubt as to the necessity of removal to another county should be resolved in favor of a venue change. [Citations.]" (*Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 578 [174 Cal.Rptr. 701, 629 P.2d 502].)

■ Several factors shall be examined in our determination of the reasonable likelihood that defendant will not receive a fair trial in Placer County: (1) the nature and extent of the publicity; (2) the size of the population of Placer County, (3) the nature and gravity of the offense, (4) the status of the victim and of the accused, and (5) whether political overtones are present.[2] As we shall explain, the first four factors weigh heavily in defendant's favor, and although each factor alone might not be determinative, we conclude that a change of venue is warranted in this case.

---

[2]We recently declined to order a change of venue in *Odle* v. *Superior Court* (1982) 32 Cal.3d 932 [187 Cal.Rptr. 455, 654 P.2d 225]. In that case, we carefully examined the size of the community, the nature and extent of the publicity, the status of the accused, the status and prominence of the victims, and the nature and gravity of the offense. Our assessment of these factors, however, did not establish a reasonable likelihood that Odle could not receive a fair trial in Contra Costa County. To the contrary, the large size of the community and the passage of a substantial length of time during which extensive publicity was absent led us to conclude that there was no reasonable likelihood that prospective jurors had been prejudiced by the pretrial publicity. We were careful to point out that Odle would be given a second chance to request a change of venue at voir dire, should the questioning of potential jurors reveal actual prejudice. We noted that a trial court's authority to change venue at that late date had been recognized as early as *Maine* v. *Superior Court, supra,* 68 Cal.2d 375.

Despite the concerns of the Chief Justice in her dissent in *Odle,* we did *not* establish a preference for a change of venue motion to be made at voir dire. (*Odle, supra,* at p. 947 (Bird, C. J., dis.).) Instead, we merely applied preexisting legal principles to the facts and concluded that under the circumstances, the "reasonable likelihood" standard had not been met, but that our determination did not preclude defendant from renewing his motion during or after voir dire.

## 1. *Nature and extent of the publicity.*

In this case, there has been extensive publicity over a two-year period, some of which has been inflammatory. Over 159 items have appeared either in a newspaper or on the radio. Several items appeared in each month during this two-year period (with the exception of November and December of 1980, and April of 1981): on twelve different days in June 1980, seven in July 1980, one in August 1980, four in September 1980, two in October 1980, three in January 1981, two in February 1981, one in March 1981, two in May 1981, four in June 1981, thirteen in July 1981, four in August 1981, two in September 1981, four in October 1981, five in November 1981, three in December 1981, six in January 1982, one in February 1982, eight in March 1982, five in April 1982, four in May 1982, and on two different days in June 1982.[3] Nearly every item contained a short description of the murder and the Williams brothers as suspects. Many of the items received front-page coverage; some were the subject of the main headline. Thus, the evidence clearly indicates that on a weekly or biweekly average for a two-year period, readers and listeners were subjected to news coverage, whether fair or inflammatory, of the murder, the trial of brother Kenneth, and the fact that defendant Fredrick will soon be tried on the same

---

[3] A study was undertaken by Milton Moeschler, who discovered that items appeared in the Auburn Journal, Roseville Press-Tribune, Lincoln News Messenger, Loomis News, Sacramento Bee, Sacramento Union and KAHI-KHYL Radio.

We note that the quantity of coverage had *not* diminished over the two-year period, but rather remained static. This situation is unlike *Odle* v. *Superior Court, supra,* 32 Cal.3d 932, where extensive coverage was given in only the initial two weeks after arrest (although a few local papers continued to give coverage to a portion of Contra Costa County through the remainder of the proceedings). Here, the major newspapers of the area, in particular the Auburn Journal, gave continual extensive coverage.

In *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574 [174 Cal.Rptr. 701, 629 P.2d 502], we noted that the three main newspapers (The Auburn Journal, Press-Tribune, and Sacramento Bee) "have a combined daily circulation in [Placer County] of 36,463, roughly equivalent to one-third of the county's population. Based upon calculations of the voting population and the newspaper circulation, at least one-half of the potential jurors in the county have been exposed to the press coverage [in Martinez'] case." (P. 579, fn. 1.)

A public opinion survey undertaken by the district attorney in this case (the scientific validity of which we do not pass on today) indicates that a large percentage of potential jurors may in fact have taken cognizance of the Williams brothers due to the publicity, particularly from the newspapers of the area. The district attorney surveyed 117 individuals from a former jury list. Of those polled, 97.4 percent did not recognize the case by name, but 64 percent of those who failed to recognize the case by name did report knowing something about the case after it had been described to them. Of these 64 percent, 25 percent recalled reading about it in the Sacramento Bee, 31.6 percent from the Roseville Press-Tribune, and 43.4 percent from the Auburn Journal; 30.3 percent heard something on television. Thus, about 27 percent of the 117 polled remembered learning about the case from the Auburn Journal, about 20 percent of the 117 from the Roseville Press-Tribune, about 16 percent from the Sacramento Bee, and about 20 percent from television. In other words, one person in four or five could remember hearing about the case from one of the major sources giving extensive coverage—the highest percentage heard from the Auburn Journal, which gave the heaviest (and often daily) coverage.

charges. Such continual, repetitive and at times inflammatory coverage indicates that potential jurors in Placer County may not be able to give defendant a fair trial.

The public opinion survey undertaken by the district attorney (noted in fn. 3, *ante*) in which 117 individuals from former jury lists were questioned, indicates that a significant percentage of potential jurors may already have formed opinions on the guilt or innocence of defendant. According to the poll, 22.4 percent of those questioned claimed they had formed such an opinion; only 64.7 percent of these individuals believed that they could disregard their opinion and decide guilt or innocence based on the evidence presented—i.e., 11 percent of the 117 individuals questioned could not disregard their opinion. And, only 79.3 percent felt that they could decide the case based only on evidence presented in the courtroom, regardless of what they had heard or read—i.e., one out of five would not be able to give defendant a fair trial.[4]

The news coverage, for the most part, consisted of factual accounts of the progress of the case. ■ Nevertheless, even factual accounts, if continuous and extensive enough, can be potentially prejudicial. "A reasonable likelihood of unfairness may exist even though the news coverage was neither inflammatory nor productive of overt hostility. [Citation.]" (*Corona* v. *Superior Court* (1972) 24 Cal.App.3d 872, 877 [101 Cal.Rptr. 411].) In addition, some of the accounts were capable of eliciting a hostile response from their audience.

For example, sexual assault or rape was referred to 145 times in the accounts. "Bullet-ridden body" was used 4 times. "Execution-style" killing was referred to 12 times (variations were used 3 additional times).

The victim was described several times as a young woman whose virginity had been robbed from her before she had been killed. For example, as recently as March 18, 1982, the Auburn Journal reported under a front-page headline that the victim, "a tall, strong but somewhat slow-thinking young woman who was saving herself for marriage—was found sprawled in the middle of Industrial Avenue near Roseville, where she had been shot to death." On April 7, 1982, in reporting on the progress of the penalty proceeding against Kenneth, the Auburn Journal on page 4 quoted the deputy

---

[4]These figures are significantly higher than those obtained in a similar survey in the *Martinez* case. In *Martinez,* as pointed out by Justice Richardson in his dissent, less than 5 percent had formed any opinion of the guilt or innocence of Martinez, and 15 percent believed they could not decide the case solely on the evidence that would be presented in court (one out of six or seven). (See *Martinez, supra,* 29 Cal.3d at p. 589 (Richardson, J., dis.).)

district attorney as saying that " '[t]he defendant took upon himself to take Heather Mead's virginity, her property and her life to satisfy his own lust and greed,' . . ." And, during the guilt phase of Kenneth's trial, the Auburn Journal reported evidence which linked Kenneth and defendant, due to their race, to the rape: "[The state criminalist] testified that hairs found on a bed sheet at the home where Mead allegedly was raped could have been left by Williams or his brother, Fredrick, who also is accused of murder. The criminalist noted that [the hairs] also could have been left [on the bed] by anyone else whose hair had the same characteristics. [¶] The criminalist said the hairs had Negroid features; the Williams brothers are black." (Nov. 19, 1981, p. 3.) The Auburn Journal noted other evidence linking Kenneth to the rape: "Defense attorney Douglas Greer asked Williams about a business card found on the bed in the master bedroom, the only item in the house which carried his fingerprint." (Jan. 26, 1982, story under front-page headline.)

There were other racial references in addition to the report of the testimony linking a black man's hair to the bed where the rape allegedly took place. In total, on nine separate occasions words or pictures indicated that the Williams brothers are black. Twice the victim was described as white. In a county where only 402 out of 117,000 people are black, such racial overtones could have a potentially devastating impact.

When Kenneth was sentenced to death, Judge Couzens was quoted as saying, " 'We have . . . the cold-blooded rape and shooting of a vulnerable young woman, a person, totally unknown to the defendant,' . . ." (Auburn Journal (May 14, 1982) article under front-page headline.)

Probably the greatest factor weighing towards a change of venue in the trial against defendant is the extensive coverage by the media, for an entire year, of the rape-murder guilt phase and death penalty phase of the trial of his brother, Kenneth. The trial was undoubtedly given particular attention by the media and its readers and listeners. Kenneth's trial was "the longest trial [in Placer County] that I've known of," according to District Attorney Daniel Higgins. (Auburn Journal (Mar. 18, 1982) front-page story.) Mr. Higgins has also commented that "the case was the first originating in Placer County to end in a death sentence in four decades." (Press-Tribune (May 14, 1982) front-page story.) Thus, the impact of the trial and its outcome could only have an impact of an undeterminable degree on any future trial to be given defendant. ▮ We note that extensive coverage of the trial of a codefendant, regardless of his relationship to another defendant, complete with an account of the evidence presented, can dangerously lead to prejudgment by the reader or listener of the news coverage of the guilt or innocence of the defendant not yet tried. (See, e.g., *Martinez* v. *Superior Court, supra,*

29 Cal.3d 574.) This case adds an additional aggravating factor: the codefendant was defendant's *brother*—increasing the danger that, due to the close affinity, the guilt finding in Kenneth's case will be transferred onto defendant.

The matter is further complicated by the publicity given to the two arrests of defendant for burglary and assault with a deadly weapon during Kenneth's trial. Seven items discussed these additional charges pressed against defendant; references were made to the fact that defendant was out on bail pending murder charges, and that his brother was currently on trial for the same charges (a few times, discussion in the same article then focused on what recently occurred in Kenneth's trial). Although the charges were later dismissed, the publicity regarding a murder defendant who was even accused of committing additional crimes while out on bail could nevertheless have inflamed potential jurors. Such an influence may render a future trial in the county unfair. In an analogous situation, a defendant escaped from the county jail pending trial. The escape "provoked a wave of alarm and concern throughout the community. . . . [T]he Attorney General contend[ed] that the publicity concerning the escape was the 'result' of petitioner's own misconduct, and hence should be excluded from consideration by reason of the doctrine of invited error. That doctrine, however, is of limited application in this context. . . . A defendant who attempts such an escape is no less entitled to a fair and impartial jury than one who, for example, attacks a guard or a fellow inmate—or, indeed, than a model prisoner. If his misconduct amounts to a crime, he can, of course, be prosecuted therefor, but he may not suffer the further and impermissible penalty of an unfair trial on the original charge against him." (*Fain* v. *Superior Court* (1970) 2 Cal.3d 46, 53 [84 Cal.Rptr. 135, 465 P.2d 23].)

In summary, the continual, repetitive coverage of the progress of the case against the two brothers, the at times inflammatory (and sometimes daily) coverage of brother Kenneth's prolonged trial resulting in the imposition of the death penalty, the very fact that the two are brothers, and the additional publicity given defendant concerning his two arrests are all factors weighing heavily in defendant's favor toward a change of venue.

2. *The size of the population of Placer County.*

In *Maine* v. *Superior Court, supra,* 68 Cal.2d 375, 387, we recognized that in small communities, a major crime is more likely to become embedded in the public consciousness than in large communities. Thus, the fact that Placer County is of relatively small population (117,000 people) is a factor in favor of defendant's motion to change venue. Indeed, we so concluded in *Martinez* v. *Superior Court, supra,* 29 Cal.3d 574, in which

we ordered a change of venue from Placer County. We there noted that we had previously ordered venue changes in cases involving counties larger than Placer County, such as Stanislaus County (*Fain* v. *Superior Court, supra,* 2 Cal.3d 46) and Santa Cruz County (*Frazier* v. *Superior Court* (1971) 5 Cal.3d 287 [95 Cal.Rptr. 798, 486 P.2d 694].)

### 3. *The nature and gravity of the offense.*

The sensational nature of the rape, robbery and murder, and the seriousness of these alleged offenses are factors weighing heavily in favor of defendant's motion for change of venue.

First, as adduced from the media coverage, this case involves the murder of a young white woman by two young black men who had robbed the victim of her virginity. The death penalty was sought against each brother; Kenneth has already been convicted and received a death sentence. It was only recently that the district attorney announced he would not seek the death penalty against defendant—but for a year and a half, this case remained a capital case. The racial and sexual overtones in what was once a death penalty case add additional sensationalism to "[t]he element of sensationalism, always present in the reporting of events concerning a capital case . . . ." (*Martinez* v. *Superior Court, supra,* at p. 581.)

In addition, several media accounts referred to the killing as "cold-blooded" or "execution-style." As we noted in *Martinez, supra,* 29 Cal.3d 574, such characterizations of a murder create a high degree of sensationalism.

Second, the crimes charged are of the utmost gravity. ■ It is well-settled that a charge of murder with special circumstances is the gravest offense carrying the gravest penalty—a factor weighing heavily in favor of the defendant. (*Odle, supra,* 32 Cal.3d 932, 941; *Martinez, supra,* 29 Cal.3d at p. 583; cf. *Frazier, supra,* 5 Cal.3d 287; *Fain, supra,* 2 Cal.3d 46.)

The People argue that the gravity of the offenses charged in the instant case is lessened because the death penalty is no longer being sought. Defendant is nevertheless facing life without possibility of parole; he is still charged with murder, which we recognize as being one of the most serious offenses, even when special circumstances are not alleged. Thus, we conclude that despite the fact that the prosecutor is no longer seeking the death penalty, the offenses charged remain of the utmost gravity.

### 4. *The status of the victim and of the accused.*

Other factors present in this case indicate that a change of venue is necessary: the victim's family has prominence in the community, while the defendant is but a stranger to that community.

The victim, Heather Mead, was a young, white college student who attended school in Rocklin. She worked for the engineering firm of her uncle, Mr. Atteberry, in Roseville. The Atteberrys have a favorable reputation in the community, and are upstanding citizens.

In contrast, defendant is a resident of Sacramento County. In addition, he is a member of a minority group which has few representatives in the community (only 402 out of 117,000 residents of Placer County are black). And, while out on bail, he was twice arrested for crimes of a violent nature: burglary and assault with a deadly weapon. In short, defendant is a young black man, a stranger to and friendless in the community, twice accused of additional violent crimes, charged with raping and murdering an untarnished young white woman whose family is upstanding in the community. The situation is quite similar to *Martinez, supra,* 29 Cal.3d 574, where we noted that Martinez, "a member of a minority group and an alleged heroin addict, 'friendless in the community,' represents exactly the type of defendant whom pretrial publicity can most effectively prejudice. [Citation.]" (Pp. 584-585.)

5. *The presence of political overtones.*

In *Maine* v. *Superior Court, supra,* 68 Cal.2d 375, prosecuting attorney and defense counsel were opponents in an upcoming election. We stated that "[u]nder these circumstances, . . . we harbor a gnawing fear that the campaign competition between two election adversaries might inadvertently intrude during the course of a proceeding in which they are also trial adversaries. Political factors have no place in a criminal proceeding, and when they are likely to appear, as here, they constitute an independent reason for a venue change." (P. 387.)

Defendant argues that political overtones are present in this case as well, because the prosecuting attorney had unsuccessfully run for office of district attorney during the pendency of this case, and one of the defense attorneys had been a staunch supporter of his opponent.

We reject the notion that the instant case involves political overtones. The defense counsel was not in fact the opposing candidate. To extend the *Maine* doctrine to this situation would severely intrude upon an attorney's ability to prosecute a case if he is also a political candidate, for it is quite likely that opposing counsel will often be a supporter of his opponent. Rather, absent an affirmative showing, a conflict should be found to exist only when both adversaries are in fact the opposing candidates.

Furthermore, the election ended several months ago, and the prosecuting attorney was defeated. (A runoff election was held in November between

the opponent and a third candidate.) Even if political overtones were present at one time (which we do not find), their effects are no longer present in this case.

CONCLUSION

██ Although no political overtones are present in the instant case, all other important factors strongly indicate that a change of venue is necessary to insure that this defendant receive a fair trial. This defendant has been continuously mentioned, on a weekly or biweekly basis at the very least, for the past two years in connection with the rape and murder of Heather Mead and the trial of, conviction of, and death sentence received by his brother on the same charges. The connection between Kenneth and defendant, as a result, has become so intertwined that a danger is present that potential jurors will transfer the guilt verdict rendered against Kenneth onto defendant. Furthermore, the effect of the extensive publicity is less likely to subside in a small community such as Placer County; the crime was of a sensational nature; the offenses charged are grave and carry severe penalties; and defendant is friendless in a community in which the victim enjoyed a certain, even if limited, prominence.

Let a peremptory writ of mandate issue directing the trial court to grant a change of venue. The alternative writ is discharged and a peremptory writ denied, however, in regard to receiving capital funds under Penal Code section 987.9.

Kaus, J., Reynoso, J., and Grodin, J., concurred.

**RICHARDSON, J.**—I concur in the judgment. Certain factors, including the nature and gravity of the offense, and the extensive local publicity devoted to the murder trial of defendant's brother for the same offense, distinguish this case from *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574 [174 Cal.Rptr. 701, 629 P.2d 502], in which I dissented. Unlike the situation in *Martinez,* a venue change seems appropriate here.

**MOSK, J.**—I concur in the judgment only because a preferable alternative is not yet available. (See my dissenting opinion in *Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 958 [187 Cal.Rptr. 455, 654 P.2d 225].)

The trial of defendant's brother lasted 10 months. That suggests an unusually large number of witnesses for both the prosecution and defense, and since the identical events are involved here the same witnesses will probably be called upon to testify in this case. The logistical problem of transporting the numerous witnesses to another county at appropriate times during the

course of the trial, and the disruption of their lives and employment for an unpleasant civic duty, make the change of venue singularly unattractive.

If a jury were impanelled in another county and imported to Placer County, only the jurors would be inconvenienced—as jurors generally are in any event—compared to the venue change difficulty of moving the defendant, prosecutor, defense counsel, security officers, records and exhibits. When the trial is moved, counsel for both the People and the defendant are confined to this one matter in the new locale, whereas if the trial remained in their home community, counsel would be able to attend to other pressing public business in the hours of recess.

Once again, I call attention to the several states that have adopted the practice of importing juries instead of changing trial venue. (See *Use of Imported Juries Gains in Popularity* (1982) 68 A.B.A.J. 668.)

Richardson, J., concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I concur in that portion of the majority opinion which concludes that a change of venue is necessary in order that petitioner receive a fair trial in this case.

However, for the reasons expressed in my dissenting opinion in *Sand* v. *Superior Court* (1983) *ante,* pages 567, 576 [194 Cal.Rptr. 480, 668 P.2d 787], I would find that petitioner is entitled to funds under Penal Code section 987.9. This is a "capital case" within the meaning of section 987.9 since special circumstances are alleged and petitioner may receive a sentence of life without possibility of parole.