[No. B058842. Second Dist., Div. Three. July 23, 1991.]

LAURENCE POWELL et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

788

## Counsel

Michael P. Stone, Patrick J. Thistle, Stevenson & DePasquale, Paul R. DePasquale, Russell J. Cole, Stewart & Barnett, William J. Kopeny, John D. Barnett and Darryl Mounger for Petitioners.

De Witt W. Clinton, County Counsel, and Frederick R. Bennett, Assistant County Counsel, for Respondent.

Ira Reiner, District Attorney, Arnold T. Guminski and Glenn R. Britton, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**THE COURT.**[*]—Petitioners Laurence Powell, Theodore J. Briseno, Stacey C. Koon, and Timothy E. Wind (collectively defendants) are police officers charged with specific charges of assault by force likely to produce great bodily injury and with a deadly weapon (Pen. Code, §§ 245, subd. (a)(1), 12022, subd. (a)(2), 1192.7, subd. (c)(8), 1203, subd. (e)(3));[1] and an officer unnecessarily assaulting or beating any person, (§§ 149, 1192.7, subd. (c)(8), 1203, subd. (e)(3)). In addition, Koon and Powell are charged with submission of a false police report by a peace officer (§ 118.1), and Koon is charged with the crime of accessory after the fact (§§ 32, 245, subd. (a)(1), 149). All the charges arise from their conduct during the apprehension and arrest of Rodney King, a suspect (hereafter the event is designated the incident).

Defendants seek a writ of mandate directing the trial court to vacate its order denying a motion to change venue and to order this case transferred to another county because of the pretrial publicity. For the many reasons discussed herein, we are compelled to direct a change of venue. We therefore grant the petition.

### SUMMARY STATEMENT

Unbeknownst to the Los Angeles Police Department (LAPD) officers involved, the incident was videotaped by a nearby resident who sold it to a local TV station. The initial showing caused shock, revulsion, outrage and disbelief among viewers. A fire storm immediately developed in the Los Angeles area, so intense and pervasive was the reaction to the videotape.

The defendants were charged with the crimes enumerated above. Questions developed about the integrity of the LAPD and its chief. The mayor of Los Angeles called for the resignation of the chief of police. That action

---

[*]Before Klein, P. J., Danielson, J., Croskey, J., and Hinz, J.
[1]All statutory references are to the Penal Code, unless otherwise indicated.

polarized the community. The police commission became vociferously involved, as did the city council.

The mayor and the chief each appointed a committee of outstanding citizens to examine the LAPD and to make recommendations. These committees were subsequently succeeded by a single commission. Its final report called for, inter alia, significant changes in the management and training practices of the LAPD.

▬▬▬ As might be expected, the incident and the resultant political turmoil received massive local media coverage, including newspapers, radio and TV which has impacted the residents.[2] We emphasize, however, that were this simply a matter of extraordinary publicity we might have reached a different conclusion. What compels our decision in this case is the high level of political turmoil and controversy which this incident has generated, which continues to this day and appears likely to continue at least until the time when a trial of this matter can be had.

We have duly considered such political controversy along with the other relevant factors pertinent to a review of the trial court's denial of the venue change motion—the size of jury pool, the status of the victim and the accused, the nature of the offense—and conclude we must reverse the trial court and direct a change of venue. So extensive and pervasive has been the coverage, and so intense has become the political fallout, potential jurors have been infected to the extent there is a reasonable likelihood that a fair and impartial trial cannot be had in Los Angeles County.

### Factual and Procedural Background

The incident occurred on March 3, 1991. Almost immediately, local TV news (KTLA, Channel 5) had obtained the rights to air the videotape. From its initial showing, the predictable reactions ranged from shock, outrage, revulsion, and fear to disbelief—all powerful human emotions to be capitalized on by the media. It was shown over and over and over again, mainly locally, but eventually, with Channel 5's release of the tape, everywhere in the world.

Locally, the question quickly arose as to how such an incident could be perpetrated by officers of the LAPD, a force with a reputation as one of the

---

[2]In making an independent evaluation of the likelihood pretrial publicity has prejudiced a defendant's right to a fair trial in the county of original venue, judicial notice of news media coverage of the case is appropriate even though some of the publicity was not presented in the court below and occurred subsequent to the ruling of that court. (*People v. Jurado* (1981) 115 Cal.App.3d 470, 482 [171 Cal.Rptr. 509].) Accordingly, we take judicial notice of the continuing and pervasive publicity involving the ongoing political controversy in the City of Los Angeles and all other matters pertinent to our de novo determination of the venue issue.

finest police departments in the world. Was this just isolated, aberrant, disgraceful conduct by a few rogue officers, or was the problem of greater significance? Was racial bias involved, given the arrestee was a Black and the defendants were all White? Was the LAPD command structure somehow at fault, and if so, did the fault include the chief, given a sergeant was on the scene? Was police training generally inadequate and, in particular, lacking in confrontational arrest procedures and sensitivity training?

Answers were sought by concerned citizens, politicians, the LAPD and investigative media. Abuse of the police car radio communication system soon came to light, disclosing numerous racist and sexist remarks. A review of the Los Angeles County District Attorney's files revealed a failure to prosecute claims of police violence on citizens, but ready prosecution of resisting arrest cases. Minority Black and Hispanic citizens came forward proclaiming the incident was not an isolated one, but conduct all too often occurring in their own communities.

Daryl F. Gates, the chief of police (Chief), defended the LAPD. Nevertheless, calls from many quarters came for him to resign, including from the mayor of Los Angeles, Tom Bradley (Mayor), himself a Black. The police commission, appointed by the Mayor, attempted to relieve the Chief of his duties by placing him on inactive status. However, the city council reinstated him on the authority of the Los Angeles City Charter provisions purporting to guarantee his independence and because of a threatened lawsuit.

Powerful factions began to develop in support of and in opposition to the Chief, which polarized politicians and ordinary residents alike. An impasse was created which checkmated a resolution of the many issues which had been raised.

During this time, the Chief endorsed and campaigned for a candidate in a vigorously contested city council race. Also, the Mayor and the Chief each designated members of what became a single blue ribbon commission to investigate the LAPD and to make recommendations.[3] Further, the Mayor called for the resignation of certain members of the embattled police commission, and then replaced two of them. One replacement, a Black, was a former deputy chief with three decades of service, who gave testimony critical of the Chief before the Commission.

The Commission filed its report within the last several weeks, recommending a number of management changes for the LAPD, including a

---

[3]The single commission was ultimately designated as the "Independent Commission on the Los Angeles Police Department" but became commonly known as the Christopher Commission (Commission) after its chair, Warren Christopher, a prominent local attorney and a former deputy secretary of state.

modification of the city charter with respect to the term of office and retention of the chief of police. An issue presented by the report was whether a citywide election was necessary to implement some of the recommendations.

Defendants were arraigned on March 26, 1991, and pled not guilty. Numerous discovery motions were filed. Defendants filed a motion for change of venue. The prosecution filed an opposition to which the defendants replied. Following a lengthy hearing, the trial court denied the motion.

On June 6, 1991, the defendants petitioned this court for a writ of mandate and requested a stay of the trial. On June 12, 1991, this court granted a stay of the trial and the jury selection process, but allowed other pretrial matters to proceed.[4]

On June 17, 1991, the trial court wrote a letter to this court indicating it was willing, contrary to its repeatedly stated position that a change of venue was not legally justified, to "forthwith transfer the venue of this case." The trial court also requested this court to vacate the stay immediately so that such order could be made on or before June 19, the date set for trial. On June 18, 1991, this court issued an order indicating its prior order did not preclude a change of venue and that no further action was required by this court with respect to the trial court's letter.

On June 18, 1991, apparently in response to a negative reaction from the district attorney's office to the possibility of a venue change, the trial court engaged in an ex parte communication with members of that office by sending a law clerk to convey the trial court's assurances the venue issue would be handled properly. The next day, June 19, the trial court again reversed its position on the change of venue issue, indicating the trial would remain in Los Angeles County.[5]

Thereafter, affidavits of prejudice for cause were filed by the defendants against the trial judge. In response, the trial judge indicated he would resist efforts to remove him from presiding over the trial. As of this date, the resolution of that issue is pending.

---

[4]We notified the parties of the possibility we would grant a peremptory writ of mandate directing the trial court to grant the motion for change of venue and established a briefing schedule. (See *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 [203 Cal.Rptr. 626, 681 P.2d 893].)

[5]Unfortunately, the trial judge's actions have contributed to the publicity surrounding this case and have resulted in no small amount of public confusion about the venue issue. The trial judge's apparent willingness to sacrifice legal principles in order to achieve an expeditious trial date makes it obvious why this court refused to vacate the stay of the trial before there was an actual change of venue ordered.

DISCUSSION

1. *Pretrial appellate review available to defendants.*

As a preliminary matter, we dispose of a novel issue raised by the trial court. County counsel, at the request of the trial court, filed a response. The response sets forth the trial court's view that section 1049.5, enacted as part of Proposition 115, and section 1050, which together require criminal cases to be expedited to the extent consistent with the ends of justice, eliminate the right of the defendants herein to seek review of an erroneous pretrial ruling by means of a petition for extraordinary writ.

Such a view is without basis in law. The right to pretrial appellate review of the ruling on a motion for change of venue is established by statute (Code Civ. Proc., § 400), and has been long and well established in the case law.

In *Maine* v. *Superior Court* (1968) 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372], our Supreme Court rejected a similar argument that pretrial appellate review of venue could unduly delay trial: "Availability of appeal often falls short of sufficient protection, since 'the burden, expense and delay involved in a trial render an appeal from an eventual judgment an inadequate remedy.' [Citation.] [Fn. omitted.]" (*Id.*, at p. 378.)

"Any delay that occurs pending appellate determination will be compensated . . . , should the defendant be found guilty after a long and costly trial, by providing a substantial safeguard against subsequent reversal on appeal for failure to have changed the venue." (*Maine, supra*, 68 Cal.2d at p. 379.) Pretrial review of a motion for change of venue reduces "a significant source of asserted error, . . . lessens the risk of reversal and thus promotes the efficient administration of justice." (*Id.*, at p. 384.) Quoting *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 363 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507], the *Maine* court agreed that " 'reversals are but palliatives' and that 'the cure lies in those remedial measures that will prevent [injustice] at its inception' [citation]. . . ." (*Maine, supra*, 68 Cal.2d at p. 384.)

The requirement to expedite criminal cases does not abrogate a defendant's right to seek immediate review of an erroneous pretrial ruling by means of petition for extraordinary writ. As stated in *Maine*, "It is neither novel nor inappropriate, therefore, for this court to review through a mandate proceeding a pretrial order which is likely to substantially affect a defendant's right to a fair trial." (*Maine, supra*, 68 Cal.2d at p. 379.)

The provisions for pretrial review by means of petition for writ of mandate are for the purpose of saving the time and expense resulting from

pretrial error by correcting the error before trial. Here, the most expeditious and economical means to handle the trial court's error in denying the motion to change venue is to decide the issue prior to the lengthy jury selection process and trial.

2. *Appellate standard of review.*

■ On a pretrial petition the appellate court must make an independent determination of the circumstances surrounding a defendant's request for change of venue to determine whether a fair trial is obtainable in the county of original venue. (*Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 937 [187 Cal.Rptr. 455, 654 P.2d 225].)

Section 1033, subdivision (a), requires a change of venue "when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county."

" '[R]easonable likelihood' " has been interpreted as requiring something less than " 'more probable than not,' " and something more than merely possible. (*People* v. *Bonin* (1988) 46 Cal.3d 659, 673 [250 Cal.Rptr. 687, 758 P.2d 1217].)

■ A motion for change of venue *shall* be granted upon a determination that dissemination of potentially prejudicial material results in a *reasonable likelihood* a fair trial cannot be had in the county of original venue. (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1000 [254 Cal.Rptr. 586, 766 P.2d 1].) A showing of actual prejudice is not required. (*People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1156 [259 Cal.Rptr. 701, 774 P.2d 730].) "[W]hen the issue is raised before trial, any doubt as to the necessity of removal to another county should be resolved in favor of a venue change. [Citations.]" (*Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 578 [174 Cal.Rptr. 701, 629 P.2d 502].)[6]

3. *Relevant factors to be considered on review.*

■ The question is whether the potential jurors can view the case with the requisite impartiality. Material factors to be considered in resolving the question include the size of the potential jury pool, the nature and extent of the publicity, the status of the accused and the victim, the nature and gravity of the offense, and the existence of political turmoil arising from the

---

[6]There is a significant difference in the standard on a posttrial review of a venue motion. Posttrial review is retrospective, extending to examination of the complete trial record, in particular the jury voir dire process. (*People* v. *Hamilton, supra*, 48 Cal.3d at p. 1157; *People* v. *Harris* (1981) 28 Cal.3d 935, 949 [171 Cal.Rptr. 679, 623 P.2d 240].)

incident. (*Williams* v. *Superior Court* (1983) 34 Cal.3d 584, 588 [194 Cal.Rptr. 492, 668 P.2d 799]; *People* v. *Jurado, supra,* 115 Cal.App.3d at p. 482.)

a. *Immense size of potential jury pool not controlling here.*

 Size of the potential jury pool is one of the factors considered on a motion for change of venue. "The larger the local population, the more likely it is that preconceptions about the case have not become embedded in the public consciousness." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 178 [222 Cal.Rptr. 184, 711 P.2d 480].)

 Los Angeles County covers 4,083 square miles. The source list used in the selection of potential jurors in Los Angeles Superior Court includes the list of persons who voted in recent elections and the records of the Department of Motor Vehicles. The potential jury pool in Los Angeles County is 6.526 million according to the Jury Services Division of the Los Angeles County Superior Court.[7]

The People contend the potential jury pool in Los Angeles County is so large that other facts are rendered irrelevant. The trial court apparently based its ruling primarily upon the size of the population in Los Angeles County. That premise has been unacceptable in other cases: "Carried to its logical conclusion, the district attorney's argument, if valid, would require that all motions for a change of venue in Los Angeles County must be denied because of its population, regardless of the amount of pretrial publicity which surrounds a notorious criminal case. This contention is disposed of by the court in *Maine* in the following language: 'We do not intend to suggest, however, that a large city may not also become so hostile to a defendant as to make a fair trial unlikely.'" (*Smith* v. *Superior Court* (1969) 276 Cal.App.2d 145, 150 [80 Cal.Rptr. 693], quoting *Maine* v. *Superior Court, supra,* 68 Cal.2d at p. 387, fn. 13.)

 In support of the motion for change of venue, defendants rely, in part, on polls of residents of Los Angeles County as reported in the Los Angeles Times. On March 10, 1991, within a week of the incident, the Los Angeles Times reported 86 percent of those surveyed had seen the videotape of the offense and 92 percent believed excessive force had been used. On March 22, 1991, the Los Angeles Times reported 94 percent of all persons surveyed in another poll described themselves as "upset" by the incident and almost two-thirds believed the force used was racially motivated.

---

[7] Pursuant to Evidence Code section 452, subdivisions (g) and (h), we take judicial notice of statistical data provided by Jury Services Division of Los Angeles County Superior Court. (See, *Tribune Newspapers West, Inc.* v. *Superior Court* (1985) 172 Cal.App.3d 443, 455, fn. 8 [218 Cal.Rptr. 505].)

Defendants retained experts to conduct a public opinion survey in the community. In a random sample of 1,000 people, 97 percent were aware of the incident. That 97 percent was then broken down into a number of categories: 3 percent believed defendants were not guilty of any offense; 14 percent had formed no opinion; 81 percent felt defendants were guilty; 70 percent of the persons from the group who felt defendants were guilty had a "strong" view about the incident.

These figures, reflecting preconceived attitudes, are significantly higher than those in similar surveys made in *Williams* v. *Superior Court, supra,* 34 Cal.3d at page 590, in which a writ of mandate was granted directing the trial court to grant a change of venue. Moreover, size of community, while an important factor, is not controlling. "[E]ach case must turn on its own facts, . . ." (*Fain* v. *Superior Court* (1970) 2 Cal.3d 46, 51 [84 Cal.Rptr. 135, 465 P.2d 23].) Here, questions peculiar to the county of original venue have rendered the seating of a jury panel without preconceived opinions as to some aspects of the case practically impossible. The factors discussed below lessen the significance of the fact that the case arises in an expansive metropolitan area with a large pool of potential jurors.

b. *Nature and extent of the publicity.*

As indicated, *ante,* the publicity surrounding the incident itself has been unequaled in Los Angeles County. Of even greater importance is the impact upon the citizenry of the political uproar resulting from the incident.

(1) *Print media coverage massive.*

The largest newspaper in Los Angeles County is the Los Angeles Times with a daily circulation of 1,242,864 and an additional 300,000 on Sundays. The county also has many other newspapers of lesser circulation, including the Daily News of the San Fernando Valley, the Press Telegram (Long Beach), the Star News (Pasadena), The Outlook (Santa Monica), and newspapers covering other communities in the greater Los Angeles area. These newspapers have blanketed Los Angeles County with coverage of the incident and related issues.

Their coverage included front page pictures, feature stories, in-depth analyses, editorials, letters to the editors, results of numerous polls conducted by individual newspapers, pictures of key individuals, and biting political cartoons. Articles have appeared daily since the incident, sometimes with several related stories in the same edition. It is impossible to pick up a copy of the Los Angeles Times and not find at least one related story, including one recent article wherein it is charged that officers who publicly criticized the chief are suffering retaliation within the department.

### (2) *Radio coverage extensive.*

Two major radio news outlets, KNX and KFWB, which cover Los Angeles County (with a combined listening audience of over 3 million), as well as many other radio stations, have given the incident and the resultant flurry of community and political activity extensive, daily coverage. Radio news is available around the clock to persons in their homes and offices and to the hundreds of thousands of commuters on the freeways. Again, it is impossible to listen to any station without hearing stories relating to the latest developments, including jokes, whether it be coverage of a news conference with the Chief, the Mayor, or an interview with the "person in the street."

### (3) *TV coverage, graphic and devastating.*

Los Angeles's Channel 5 (KTLA) obtained copies of the now notorious videotape by buying the rights thereto from a citizen who witnessed and taped it.[8] Its initial screening caused overwhelming reactions as viewers watched several officers land 56 baton blows and 6 kicks about the body of the downed man. It was an exposition of brutality and emotions ran high. It eventually was seen by viewers all over the world, and the world's reaction filtered back to a shocked community. Since the initial showings of the incident, local TV stations, like the other media, have provided daily coverage of all resultant events.

Channels 2 and 4 have featured local talk shows wherein interviews of the Chief, the Mayor and members of the Commission, the city council and the police commission have been conducted. The late night talk show hosts have invoked humor in criticizing all political personalities involved. Indeed, a resident of Los Angeles County cannot watch TV news without being subjected to the many ramifications of this volatile topic.

While it is true that in some cases the pervasive " 'nature of modern communications media limits the effectiveness of . . . change of venue[,]' " (*People* v. *Manson* (1976) 61 Cal.App.3d 102, 177 [132 Cal.Rptr. 265], quoting Comment, *Gagging the Press in Criminal Trials* (1975) 10 Harv. C.R.-C.L. L.Rev. 608, 617-618), the nature of the publicity in other notorious criminal cases, such as *Manson*, is totally unlike the publicity surrounding this case. The publicity in *Manson* arose from the nature of the crimes, the manner in which the murders had been committed, and the persons involved. *Manson* was not entangled in local politics, did not focus on local politicians, and did not involve issues unique to Los Angeles County.

---

[8]If media reports are correct, that person is now suing for a share in the revenues the tape has generated; such litigation would doubtless be pending in Los Angeles County contemporaneously with the instant criminal proceeding.

c. *Status of victim and accused.*

Important and unusual factors in this case are the status of the defendants as White law enforcement officers and the arrestee as a Black, the widespread media usage of the videotape disclosing the nature of the arrest, and the publication of internal police department documents.

It cannot be disputed that difficulty in obtaining a fair trial in Los Angeles County is exacerbated by the fact the defendants are police officers, sworn to protect citizens, to uphold the law and to maintain peace in the community. Their status is the basis of the intense coverage and repeated showing of the videotape. The fact that the videotape depicts local officers in such conduct threatens the community's ability to rely on its police and has caused a high level of indignation, outrage, and anxiety.

d. *Nature and gravity of the offense.*

Simply stated, the charges here are assault and battery under color of law. While rendered more important in the public consciousness because of the dramatic videotape and the persons charged are law enforcement officers, the crime of assault and battery does not compare to the gruesome murders involved in other notorious cases tried in Los Angeles County, e.g., Charles Manson, the "Night Stalker," the "Hillside Strangler." Although Los Angeles County was able to seat a fair and impartial jury in cases with widespread publicity involving crimes even more heinous than the offenses charged here, those crimes did not involve defendants who were local police officers or the ensuing local political controversy.

e. *Political factors.*

As previously indicated, shortly after the incident, a political furor erupted which has been compressed into an intense four-month period. The Mayor called for the Chief either to resign or to retire. The police commission placed the Chief on inactive status; he responded with a lawsuit. The city council intervened reinstating the Chief. A power struggle ensued among the Chief, the Mayor, the city council and the police commission.

During this period, vigorously contested elections for city council positions were occurring throughout the city. All candidates took positions essentially in support of either the Mayor or the Chief. The Chief himself endorsed and campaigned for at least one candidate who was seeking another term to represent northwest valley residents. Such support was even reflected in bumper stickers.

In an effort to resolve the political crisis and address many of the issues which had been raised, the Commission was formed. All 10 members were

high profile citizens of the greater Los Angeles area. The Commission's charge was to review the structure and operation of the LAPD. Confidential testimony was given and other evidence was received over a three-month period. A 228-page report was filed by the Commission on July 9, 1991, with many recommendations. With respect to the position of police chief, it recommended term limitations and additional power within the police commission to fire a chief. Such recommendations may require a citywide election to amend the city charter.

In addition, the Commission's report made a number of findings. For example, it found that: (1) excessive force was used by many officers; (2) racial and sexual bias was reflected in the conduct of many officers; (3) sexism existed within the LAPD; (4) there had been a failure of the LAPD command structure effectively to monitor, discipline and control officers accused of improper conduct; (5) there was frequent use of the Mobile Digital Terminal communication system to make scurrilous and offensive racist and sexist remarks without concern for possible reprimand from LAPD leaders; and (6) there had been a lack of accountability of the LAPD to civilian oversight authorities.

Following the issuance of the report, rumors abounded as to the Chief's plans, alternatively to remain at the helm indefinitely, or until a replacement was found, or until the voters spoke at an election, or to retire or to resign at a date of his choosing. Although as of this date his status is apparently resolved,[9] it is still a matter of continuing and acrimonious debate.[10]

There is a claim that officers who gave damaging testimony about the department and the Chief before the Commission suffered retaliation within the department. The same complaint was made by officers making critical public comments. On the other hand, officers who were publicly supportive of the Chief were expecting promotions within the department.

Also in the wake of the report, two police commission members resigned and were promptly replaced. One replacement had been, until his retirement,

[9] On July 22, 1991, the Chief publicly announced an intention to retire in April of 1992, provided a permanent successor had been chosen. This announcement has been met with a mixed reaction from public officials and the media and follows an earlier announcement by city council members Ferraro and Wachs that the Chief had agreed to retire by the end of 1991. As this opinion is filed, various community groups, including minorities and women, have reportedly formed coalitions to gather signatures to put a recall election on the ballot seeking to remove the Chief by this means.

[10] The public controversy has not been limited to the Chief's tenure or even to those issues most directly related to the incident. As a part of the public discussion of LAPD management policies, the media have critically focused upon the personal religious, social and political views of one senior LAPD officer frequently mentioned as a possible successor to the Chief. Such views were also of interest to the police commission because of their possible impact on management policy.

the highest ranking Black officer in the department, who had been publicly critical of the Chief and now calls for the Chief's resignation. The other replacement is a woman of long-standing public service to the Los Angeles community who also is demanding the Chief step down.

■ Such "[p]olitical factors have no place in a criminal proceeding, and when they are likely to appear, as here, they constitute an independent reason for a venue change." (*Maine* v. *Superior Court, supra,* 68 Cal.2d at p. 387.) *Maine* discusses a change of venue where the case had "to some extent become involved in county politics." (*Id.,* at p. 386.) In *Maine,* the trial judge originally assigned to hear the case, counsel for one of the defendants, and the prosecuting attorney were candidates for the same office. Even though a judge from outside the county had been assigned to hear the case, *Maine* ordered a change of venue because "we harbor a gnawing fear that the campaign competition between two election adversaries might inadvertently intrude during the course of a proceeding in which they are also trial adversaries." (*Id.,* at p. 387.)

■ The People rely on *Williams* v. *Superior Court, supra,* 34 Cal.3d 584, in which the court rejected a defense contention that political overtones required a change of venue. *Williams* found no unacceptable political problems where the prosecuting attorney had unsuccessfully run for office several months before the trial and defense counsel had not been a candidate. *Williams* found even if political factors had been present at one time the effects were no longer present after the passage of a substantial amount of time and a subsequent election in which the prosecuting attorney was not a candidate. (*Id.* at pp. 594-595.)

Contrary to the People's contention, *Williams* does not stand for the proposition that political overtones are a factor in a motion for change of venue only where counsel for each side is a candidate in an election campaign. *Williams* holds that the fact counsel for one party is a candidate for election is not in itself sufficient to require a change of venue. (*Williams, supra,* 34 Cal.3d at pp. 594-595; see *People* v. *Hamilton, supra,* 48 Cal.3d at p. 1160.) For example, news items indicating there was "considerable political debate concerning the fiscal impact of the trial," arising from the prosecution's estimate of the cost of trial in a brutal murder case, was considered as one of the factors supporting a change of venue in *People* v. *Tidwell* (1970) 3 Cal.3d 62, 65-66, 71 [89 Cal.Rptr. 44, 473 P.2d 748].

*Smith* v. *Superior Court, supra,* 276 Cal.App.2d 145, involved a trial in which the defendant, an appointee of the incumbent candidate for office in Los Angeles, had been indicted on bribery charges. The indictment became an issue in the political campaign. The insertion into the campaign of the

indictment and the resulting publicity was a factor in finding the news media coverage of the matter had been so pervasive that a change of venue was required. (*Id.* at pp. 148-149.)

In addition, we note that this court has received a document which can be construed only as a threat of community violence if the case is transferred to another venue. The document was widely publicized in the Los Angeles Times and other local newspapers. The possibility of riots also has been mentioned on television news coverage. In dealing with the issue, under similar circumstances, a Florida court recently held: "We simply cannot approve the result of a trial conducted, . . . in an atmosphere in which the entire community . . . was . . . justifiably concerned with the dangers which would follow an acquittal, but which would be . . . obviated if . . . the defendant was convicted. Surely, the fear that one's own county would respond to a not guilty verdict by erupting into violence is as highly 'impermissible [a] factor,' [citation], as can be contemplated. Surely too, there was an overwhelmingly 'unacceptable risk,' [citation]" of an adverse effect upon the right of every citizen to a fair determination of guilt or innocence based solely upon evidence presented at trial. (*Lozano* v. *State* (Fla.Dist.Ct.App. 1991) 584 So.2d 19, 22-23.)

The threat of violence here does not yet arise from the ultimate determination of guilt or innocence but from this pretrial procedural matter dealing with venue. If the mere possibility an order directing that trial be conducted outside Los Angeles County gives rise to such threats, we must draw the inevitable inference about the possibility of threats which could surface during the trial itself. Such unacceptable attempts to influence the judicial proceedings at this early stage add another impermissible factor into the boiling cauldron surrounding this case, making it imperative to take every step possible to ensure that an impartial unbiased jury be seated.

■ "When a spectacular crime has aroused community attention and a suspect has been arrested, the possibility of an unfair trial may originate in widespread publicity describing facts, statements and circumstances which tend to create a belief in his guilt. [¶] Indispensable to any morally acceptable system of criminal justice is a verdict based upon evidence and argument received in open court, not from outside sources. [Fn. omitted.] When community attention is focused upon the suspect of a spectacular crime, the news media's dissemination of incriminatory circumstances sharply threatens the integrity of the coming trial. . . . [¶] The goal of a fair trial in the locality of the crime is practically unattainable when the jury panel has been bathed in streams of circumstantial incrimination flowing from the news media. [Fn. omitted.] . . . An honest juror may admit knowledge or tentative prejudgment and find himself excluded. Many will sincerely try to set aside

their preconceptions and give assurance of impartiality, yet unconsciously bend to the influence of initial impressions gained from the news media. [Fn. omitted.]" (*Corona* v. *Superior Court* (1972) 24 Cal.App.3d 872, 877-879 [101 Cal.Rptr. 411].)

 While we recognize that the incident and some of its ramifications have received widespread publicity elsewhere, the impact on residents of Los Angeles is unquestionably much greater because of the unabated and acrimonious total involvement of city officials and local community leaders. There is no doubt that these political biases would invade the jury box if the case were tried in Los Angeles County.

## CONCLUSION

 Every person charged with a criminal offense is entitled to a trial free of the "unacceptable risk . . . of impermissible factors coming into play." (*Estelle* v. *Williams* (1976) 425 U.S. 501, 505 [48 L.Ed.2d 126, 131, 96 S.Ct. 1691].)

"The potential of community bias mounts in direct ratio to the pervasiveness of publicity. [Fn. omitted.] . . . In counties geographically removed from the locale of the crime, lack of a sense of community involvement will permit jurors a degree of objectivity unattainable" in the locale of the crime itself. (*Corona* v. *Superior Court, supra,* 24 Cal.App.3d at p. 883.) Most significantly, such jurors are far less likely to be involved in the prevailing political controversies which we have set out in some detail and which appear to be reasonably limited to the greater Los Angeles area.

The record presented before the trial court was sufficient to support defendants' contention they cannot receive a fair trial in Los Angeles County and their contention becomes increasingly more obvious as each day passes. The events of which we have taken judicial notice not only add further support to the defendants' contention but lead us inexorably to conclude there is more than the statutory "reasonable likelihood" standard present here. Under the totality of the circumstances, a change of venue is clearly necessary to assure that defendants have a fair and impartial trial.

We conclude there is a substantial probability Los Angeles County is so saturated with knowledge of the incident, so influenced by the political controversy surrounding the matter and so permeated with preconceived opinions that potential jurors cannot try the case solely upon the evidence presented in the courtroom. Accordingly, we grant the petition for writ of mandate.

We leave the ultimate selection of the site for a fair trial to the trial court with directions to weigh the various factors bearing upon the selestion of a forum free from the unacceptable risk that a fair trial cannot be conducted. In implementing the transfer, the trial court must follow the procedure set forth in California Rules of Court, rules 842 and 843.

## DISPOSITION

Let a peremptory writ of mandate issue directing the trial court to grant the motion for change of venue, to determine a site where a fair trial can be held, and to transfer the case to that site.

Upon transfer to another county, the stay of the trial and related jury selection proceedings, heretofore issued by this court, is vacated.