Filed 3/5/26  In re M.C. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B348066 (Super. Ct. Nos. 23JV00430, 23JV00430A, 23JV00430B, 23JV00430C) (Santa Barbara County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>M.C.,<br><br>    Defendant and Appellant. | |

M.C. was charged in four separate juvenile petitions with various offenses, including first degree murder, committed when he was 17 years old.  He appeals from the juvenile court's order transferring him to a court of criminal jurisdiction pursuant to

Welfare and Institutions Code section 707.[1]  He contends the juvenile court abused its discretion by failing to properly evaluate the criterion as required by section 707, subdivision (a).  We affirm.

*Facts of the Alleged Offenses*

On December 9, 2023, at approximately 2:26 p.m., police responded to reports of shots fired at Oakley Park in Santa Maria.  Upon arrival, officers located 15-year-old Jesus Cabrera lying face down on the ground, covered in blood, and suffering multiple gunshot wounds.  Cabrera was transported to the hospital where he was declared deceased.  An autopsy revealed he had been shot once in the back and the bullet exited through his left cheek.

Police interviewed several witnesses who reported hearing two to three gunshots and seeing several vehicles leaving the scene immediately after the shooting.  Police obtained surveillance video from the area, which showed several vehicles parked south of the pathway near where Cabrera was walking.  Cabrera paused briefly before running away as the first gunshot was heard.  Approximately two seconds later, a second gunshot was heard, and Cabrera collapsed.  After the shooting, an individual wearing dark clothing was observed bending down and retrieving an item believed to be a spent shell casing before fleeing.  Police later retrieved a nine-millimeter shell casing from the scene.

Investigators identified the three vehicles from the surveillance video, including a black Chevrolet Impala, which was registered to appellant's mother.  Officers conducted a search

---

[1]  All further undesignated statutory references are to the Welfare and Institutions Code.

of appellant's residence and recovered a black, non-serialized semiautomatic handgun concealed inside a jacket. A nine-millimeter shell casing was also recovered from inside the Chevrolet Impala. Appellant was taken into custody and booked at the Juvenile Justice Center (JJC).

Ballistics testing linked the firearm recovered from appellant's residence to the Oakley Park shooting as well as several other shootings that had occurred in the area. Investigators also linked the Chevrolet Impala to other cases and reviewed surveillance video showing the vehicle in an area claimed by the West Park criminal street gang.

*Other Shooting Incidents*

On December 11, 2023, officers responded to a shooting at a Santa Maria motel. Surveillance video showed an individual entering and exiting the motel multiple times before pointing and firing a handgun at an occupied room. Ballistics evidence recovered from the scene tied the firearm used in the motel shooting to the firearm recovered from appellant's residence.

In January 2024, investigators reviewing various social media accounts discovered a group chat related to a prior shooting incident from August 6, 2023. In the group chat, several individuals conspired to rob the victim of his firearm. Appellant also discussed destroying evidence by taking the firearm used in the shooting to an unknown individual to replace the barrel, slide, fire pin, and ejector, which would create a new ballistic profile and prevent law enforcement from linking the firearm to other cases.

On September 29, 2023, officers responded to reports of shots fired. The victim, M.M., reported that several juveniles had challenged him to a fight, and one exposed a handgun. The

3

group of juveniles continued walking, when the suspect with the handgun fired a shot in M.M.'s direction. M.M. believed he was targeted due to his perceived affiliation with the Northwest Criminal Street gang, a rival of West Park. M.M. described the juveniles as members of "Step Team," a crew from West Park, who had been tagging in M.M.'s alley.

Investigators concluded that appellant was involved in the shooting based on descriptions, social media posts, group chats, and appellant's school absence records.

*Section 602 Petitions*

Case No. 23JV00430

In December 2023, the People filed a section 602 petition alleging appellant committed first degree murder (Pen. Code, § 187, subd. (a)(1), count 1), with special allegations of street terrorism (Pen. Code, § 186.22, subd. (b)(1)(C)), and a principal's intentional discharge of a firearm causing great bodily injury and death (Pen. Code, § 12022.53, subds. (b)-(e)(1)). The People requested a hearing to determine whether appellant should be transferred to the jurisdiction of the criminal court pursuant to section 707. Appellant was ordered detained in juvenile hall.

Case No. 23JV00430-A

In March 2024, the People filed a second section 602 petition, alleging appellant committed assault with a firearm (Pen. Code, § 245, subd. (a)(2), count 1), shooting at an inhabited dwelling (Pen. Code, § 246, count 2), and having a concealed, unregistered firearm (Pen. Code, § 25400, subd. (a)(2)). As to counts 1 and 2, it was alleged that appellant committed the offenses for the benefit of or at the direction of or in association with a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(B)).

4

<u>Case No. 23JV00430-B</u>

In April 2024, the People filed a third section 602 petition alleging appellant committed accessory after the fact to the crime of attempted robbery (Pen. Code, § 32, count 1), with the special allegation of street terrorism (Pen. Code, § 186.22, subd. b)(1)(a)). The petition also alleged two counts of possession of firearm by a minor (Pen. Code, § 29610, subd. (c), counts 2 & 3), with a gang enhancement (Pen. Code, § 186.22, subd. (d)).

<u>Case No. 23JV00430-C</u>

In June 2024, the People filed a fourth section 602 petition alleging appellant committed assault with a firearm (Pen. Code, § 245, subd. (a)(2), count 1) and conspiracy to commit assault with a firearm (Pen. Code, § 182, subd. (a)(1)), with special allegations of street terrorism as to each count (Pen. Code, § 186.22, subd. (b)(1)).

The People requested a hearing as to each of the subsequently filed petitions to determine whether appellant should be transferred to the jurisdiction of the criminal court pursuant to section 707.

<em>Transfer Hearing</em>

The juvenile court conducted a contested transfer hearing. The People presented witness testimony and documentary evidence, including police reports, appellant's juvenile records, a gang enhancement report, the transfer evaluation report, and various other documents.

<u>Probation Officer Brianna Cantero</u>

Santa Barbara Probation Officer Brianna Cantero prepared the fitness/transfer report recommending appellant be transferred to a court of criminal jurisdiction. In preparing her report, Cantero interviewed appellant, his parents, the

detectives, and attended a treatment team meeting. She examined appellant's social history, including his relationship with his parents and appellant's disclosure of sexual abuse by a babysitter when he was eight years old. Cantero testified that appellant was not amenable to rehabilitation while under the jurisdiction of the juvenile court based primarily on the sophistication of the crime, the length of services that would be offered to him at JJC, and the gravity of the offense.

Probation Officer Daniel Nava

Daniel Nava worked as a probation officer at JJC and was in charge of the Arise and PEAK programs, which counseled youths to leave gangs. He testified that appellant did not ask for help to facilitate dropping out of his gang.

Dr. Amy Watt

Dr. Amy Watt, a clinical psychologist, prepared the transfer evaluation report, examined the five transfer criteria, and concluded appellant did not meet the criteria to remain in the juvenile court system. In preparing her evaluation, Dr. Watt reviewed police reports and various school and juvenile records, but did not interview appellant. Dr. Watt testified that appellant did not suffer from any developmental issues, but noted a history of varied school performance, behavioral difficulties, and low grades.

In examining the sophistication criteria and the original petition, Dr. Watt noted the shooting appeared to be gang-related, involved planning, and knowledge about how to prevent shell casings from being traced. She also noted that appellant communicated with another gang member and advised him how to get rid of the gun and change parts of the gun to prevent it from being traced. When police searched his home, appellant

6

attempted to hide the firearm in his parents' bedroom to avoid taking responsibility for the offense. Dr. Watt found this criterion applied.

As to appellant's potential for rehabilitation, Dr. Watt believed it was "unclear" whether this criterion was met. She noted that appellant had a tendency to behave differently in different settings with different people. For example, he presented very well when interviewed by probation and his therapist, and was described as respectful. But the juvenile records indicated otherwise. Dr. Watt noted that appellant had demonstrated improved behavior but expressed concern that such improvement had been situational and influenced by the pending transfer proceedings rather than sustained rehabilitation. She opined that if appellant were put back with other gang members, there might be behavior difficulties. As to this criterion, Dr. Watt was neutral.

As to appellant's delinquent history, Dr. Watt noted that appellant had a number of police contacts for "minor offenses" and he had not been arrested "a lot" before the offense in 2023. However, Dr. Watt believed this criterion applied given appellant's strong association with the gang and his conduct in juvenile hall.

As to appellant's previous attempts to rehabilitate, Dr. Watt noted that although appellant had never been on probation in the community, the fact that he was arrested for the current shooting incident in December 2023, indicated that any previous attempts to rehabilitate were unsuccessful. Dr. Watt concluded this criterion favored transfer.

As to the circumstances and gravity of the offense, Dr. Watt found this criterion applied. She noted there were a number of

shootings that occurred over a short period of time, which involved the same gun, were all gang related, and were "extremely serious."

Given appellant's behavior in custody, including fighting, defiance of authority, smoking marijuana, staging an escape attempt, coordinating others to distract staff, and his ongoing, strong focus on gang rivalry and violence, Dr. Watt believed appellant should be transferred to adult court.

Detective Juan Rubio

Santa Barbara Police Detective Juan Rubio testified that replacing the slide on a firearm completely replaces the ejector, the firing pin, and the barrel, which is significant because such a modification changes the ballistic profile of the firearm and makes it difficult to link to other cases.

Detective Ruben Peinado

Detective Ruben Peinado works for the Santa Maria Gang Suppression Team. He prepared the gang packet, which contained numerous photos of appellant and other West Park gang members making gang signs. Detective Peinado testified that appellant was an active gang member in good standing with the West Park criminal street gang.

Warden Raythel Fisher, Jr.

Warden Fisher, now retired, worked as the warden of Valley State Prison in Chowchilla from 2014 to 2021. He testified that the programs offered through juvenile hall were insufficient to help gang members who are already entrenched in gangs to drop out.

Defense counsel did not present any witnesses.

8

*The Juvenile Court's Ruling*

In July 2025, the juvenile court granted the motion to transfer appellant's case to adult criminal court. In a detailed ruling, the juvenile court acknowledged the People's burden to prove, by clear and convincing evidence, that appellant was not amenable to rehabilitation while under the jurisdiction of the juvenile court. The juvenile court analyzed each of the five statutory factors set forth in section 707, considered the totality of the evidence, explained how that evidence applied to each statutory factor, and ultimately concluded appellant was not amenable to rehabilitation under its jurisdiction.

Degree of Criminal Sophistication

The juvenile court found the offenses alleged in each petition were committed with "criminal sophistication" and "demonstrate[d] a pattern of intentional offenses" committed by appellant for the benefit of his gang. The juvenile court cited appellant's age, his status as an active gang member, and noted that the alleged offenses were not the result of "impetuosity" but were committed with deliberation and purpose. As to the original petition, appellant shot and killed a 15 year old as he ran away. After the shooting, appellant or one of his companions picked up the shell casings in an effort to conceal evidence and made no effort to assist the victim.

As to Petition A, the juvenile court found the alleged offense did not exhibit a high degree of sophistication but was nonetheless deliberate and committed with the clear intent to terrorize the victim. As to Petition B,[2] the juvenile court found

---

[2] The juvenile court noted that Petition B does not allege a felony offense listed in section 707, subdivision (b), but nevertheless considered the facts underlying the petition to

9

appellant demonstrated a "high level of knowledge and sophistication" regarding altering a firearm to eliminate evidence. As to Petition C, the juvenile court found the offense, which consisted of shooting at a victim, his house, and vehicle on multiple occasions, was done in attempt to intimidate the victim. Additionally, the casings found at the scene matched the firearm found in appellant's home, and the victim was believed to be affiliated with a rival gang.

The juvenile court acknowledged appellant's past trauma but found it did not mitigate against or explain his conduct. The juvenile court further noted that there is no evidence that appellant suffered from an intellectual disability, developmental delays, or any notable mental health or emotional issues that would explain or form the basis for his criminal behavior. Instead, appellant had a "lengthy work history," which showed his ability to conform and engage in lawful activity. The juvenile court found the only consistent factor and motivation underlying appellant's behavior is his gang affiliation.

The juvenile court also noted that appellant's gang involvement demonstrated criminal sophistication through his use of social media to coordinate gang activities. His behavior in custody further demonstrated his criminal sophistication, including coordinating other youth in disruptive conduct, gang-related fights, and disobedience. Appellant was seen as a leader within his gang. Based on the totality of the evidence, the juvenile court concluded this criterion weighed in favor of transfer.

---

evaluate the "totality of the circumstances" in determining whether to transfer appellant to adult criminal court. (Citing Cal. Rules of Court, Rule 5.770, Advisory Committee Comment.)

10

Amenability to Rehabilitation Prior to Expiration of Juvenile Jurisdiction

In analyzing this criterion, the juvenile court noted that appellant had already been detained for approximately one year and seven months. During the majority of that time, appellant engaged in numerous instances of disruptive behavior, including threatening staff, refusing to follow directions, engaging in gang-related fights, flashing gang signs, and possession of contraband. Appellant continued to deny any gang affiliation even though many of the incidents were gang related. The juvenile court acknowledged that appellant's behavior had recently improved, but attributed it to appellant's concerns about a transfer to criminal court rather than a sincere desire to rehabilitate. The juvenile court concluded, "Based upon the evidence presented, [the] court cannot find that sufficient time exists for rehabilitation of the youth before expiration of juvenile jurisdiction."

Previous Delinquent History

The juvenile court noted appellant had two prior referrals to juvenile probation for minor offenses. This criterion weighed against transfer.

Success of Previous Attempts to Rehabilitate Minor

The juvenile court gave no weight to this criterion, noting that appellant had only engaged in two prior informal diversion programs.

Circumstances and Gravity of the Alleged Offenses

The juvenile court observed that the offense alleged in the original petition involved the most serious and grave possible harm, the loss of life. Appellant confronted a 15-year-old minor, then "callously shot and killed him as he was running away" by shooting him in the back. Appellant's actions were not the

11

product of rage or impetuosity, but were deliberate and intentional.  The additional charges also involved violent and calculated assaults with a firearm against other individuals.  The juvenile court found this criterion "weighs heavily for transfer."

*Discussion*

Appellant contends the juvenile court abused its discretion in three ways by: (1) failing to properly consider appellant's community environment and childhood trauma in evaluating the degree of criminal sophistication; (2) improperly discounting appellant's recent positive behavior and relying on speculation about his motives when evaluating his potential for rehabilitation; and (3) failing to analyze how appellant's trauma affected his development when evaluating the gravity of the offense.  As we shall explain, we disagree.

We review the juvenile court's determination to transfer a minor to criminal court for abuse of discretion.  (*In re J.S.* (2024) 105 Cal.App.5th 205, 211 (*J.S*).)  "The court's factual findings are reviewed for substantial evidence, and its legal conclusions are reviewed de novo. [Citation.] A decision based on insufficient evidence or the court's "'erroneous understanding of applicable law'" is subject to reversal. [Citation.]" *(Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 187.)

Section 707 provides that the People may move to transfer to adult court any minor 16 years of age or older alleged to have committed one of several enumerated offenses, including murder. (*Id.*, subds. (a)(1), (b)(1).)  To prevail on this motion, the People must establish, by clear and convincing evidence, that the minor is "not amenable to rehabilitation while under the jurisdiction of the juvenile court."  (*Id.*, subd. (a)(3); *In re S.S.* (2023) 89 Cal.

12

App.5th 1277, 1288 ["'amenab[ility] to rehabilitation'" is the "ultimate determination"]; *J.S., supra,* 105 Cal.App.5th at p. 212 [same].)

In making this determination, the juvenile court must consider five specific factors: (1) "[t]he degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (*id.*, subd. (a)(3)(B)(i)); (3) "[t]he minor's previous delinquent history" (*id.*, subd. (a)(3)(C)(i)); (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (*id.*, subd. (a)(3)(D)(i)); and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (*id.*, subd. (a)(3)(E)(i)). "The weight to be given each of these factors is within the court's discretion." (*D.W. v. Superior Court* (2019) 43 Cal.App.5th 109, 116.)

The statute also sets forth a nonexhaustive list of relevant factors for the juvenile court to consider with respect to each of the five criteria. (§ 707, subds. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).) If the juvenile court orders a transfer to criminal court, it must "recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Id.*, subd. (a)(3).)

*Application of Section 707 Transfer Criteria*

Degree of Criminal Sophistication

When evaluating the degree of criminal sophistication exhibited by the minor, section 707 requires the juvenile court to "give weight to any relevant factor, including, but not limited to,

13

the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (*Id.*, subd. (a)(3)(A)(ii).)

Appellant contends the juvenile court misapplied the criminal sophistication criterion by failing to consider his community environment, including evidence of gang violence and how that may have influenced his development and behavior as required by section 707, subdivision (a)(3)(A).

While the juvenile court is required to give weight to "any relevant factor," including those identified under each criterion, nothing in the statute obligates the juvenile court to exhaustively detail how it assessed every such factor in its written ruling. (See *J.S.*, *supra*, 105 Cal.App.5th at pp. 213-214 [juvenile court's express consideration of the evidence, including reports, exhibits, and witness testimony, necessarily included evidence of appellant's social, emotional, and intellectual history]; *People v. Myers* (1999) 69 Cal.App.4th 305, 310 ["The court is presumed to have considered all of the relevant factors"].) Accordingly, this contention fails.

Appellant's contention that the juvenile court "erroneously dismissed" the relevance of his childhood trauma and sexual abuse also fails. The juvenile court properly considered appellant's trauma, but concluded it did not mitigate or explain

14

his conduct. Indeed, Dr. Watt noted there was no documented mental health issues requiring treatment or medication. The juvenile court could reasonably find that appellant's trauma was not entitled to significant weight and was well within its discretion to do so when considering all of the relevant factors under this criterion.

Potential for Rehabilitation in Juvenile Justice System

Appellant contends the juvenile court erred in finding that he could not be rehabilitated within the remaining six years in the juvenile court's jurisdiction. He claims his recent positive behavior constitutes substantial evidence of rehabilitation potential and the court's reliance on speculation about his motives was improper. We are not persuaded.

Here, the juvenile court noted that appellant had been in custody for approximately 19 months. During the majority of that time, he engaged in a pattern of behavior, much of it gang related, which demonstrated a "lack of interest in programming and rehabilitation." The juvenile court acknowledged appellant's positive behavior, and commended him for it, but noted it was "very recent." The juvenile court did not rely on speculation, but considered all of the evidence and information in making its decision as to this criterion. Appellant may have weighed the evidence differently, but that does not amount to error. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1054; *People v. Thomas* (1992) 2 Cal.4th 489, 514.)

Circumstances and Gravity of the Offense

Appellant contends the juvenile court abused its discretion because it failed to analyze how his trauma affected his development when evaluating the gravity of the offense. This contention fails. Regardless of appellant's mindset, the charged

15

offenses were grave and serious, with murder being "one of the most serious offenses." (See *Williams v. Superior Court* (1983) 34 Cal.3d 584, 593.)

On this record, substantial evidence supports the juvenile court's finding that appellant is not amenable to rehabilitation while under the jurisdiction of the juvenile court. It therefore reasonably exercised its discretion to transfer appellant to adult criminal court.

*Disposition*

The order is affirmed.

NOT TO BE PUBLISHED.

YEGAN, Acting P. J.

We concur:

BALTODANO, J.

CODY, J.

16

Gustavo Lavayen, Judge
Superior Court County of Santa Barbara

_____

Laura Vavakin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and David A. Wildman, Deputy Attorney General, for Plaintiff and Respondent.